## LAKE STEAM SHIPPING CO., Limited, v. BACON.

### (District Court, S. D. New York.  May 2, 1904.)

1. SHIPPING—CHARTER PARTY—DISABLING OF VESSEL BY STRANDING.

> A steamship was chartered for a voyage and return at a stipulated hire per month.  The charter required her to be tight, staunch, and strong, and in every way fitted for the service.  It also contained a provision that in the event of loss of time from "breakdown of machinery, stranding, fire, or damage preventing the working of the vessel for more than twenty-four running hours the payment of the hire shall cease until she be again in an efficient state to resume her service."  On the return voyage the ship stranded, and was several days on the rocks, receiving such injury to her hull that two of her holds containing cargo were partly filled with water, and remained so through the remainder of the voyage, which was completed only by the use of extra pumps, which were procured at a port to which she deviated after the accident.  *Held* that, the vessel not having been in an efficient state after the stranding, no charter hire could be recovered after that time, except for the time taken in discharging.

2. SAME—HARTER ACT.

> The Harter Act, Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946], does not affect the rights of parties under a charter party.

In Admiralty.  Suit to recover charter hire.

Convers & Kirlin, for libellant.

Wheeler, Cortis & Haight, for respondent.

ADAMS, District Judge.  This action was brought by the Lake Steam Shipping Company, Limited, as owner of the steamship Avonmore, to recover from Daniel Bacon, the charterer, the hire of the steamship from April 16, 1903, to May 13 following, amounting, it is claimed, to $2545.14.  It is admitted by the libellant that the hire was properly suspended from April 11, 1903, at 7 A. M. until April 16, at 10:30 A. M., the period during which the vessel was stranded on Anegada Reef, Virgin Islands.  The amount originally claimed was $2526. There was an error in the libel as to the time the vessel was removed from the reef, which the testimony shows was April 16th at 10:30 A. M. instead of 4 P. M. as first claimed.  A correction of the error involved an additional claim of $19.14.

The steamship was in the service of the charterer, under a charter party dated January 28, 1903, which provided "for one round trip to the West Indies and/or Mexico" and further:

"4. That the Charterers shall pay for the use and hire of the said vessel five hundred and eighty pounds (£580) British Sterling per calendar month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire to continue until her delivery, with clean holds to the Owners (unless lost) at a port in the United States north of Hatteras at charterers option. * * *

6. Payment of the said hire to be made in cash half monthly in advance in New York. * * *

15. That in the event of the loss of time from deficiency of men or stores, breakdown of machinery, stranding, fire or damage preventing the working of the vessel for more than twenty-four running hours, the payment of the hire shall cease until she be again in an efficient state to resume her service, but

---

¶ 2. Statutory exemption of shipowners from liability, see note to Nord-Deutscher Lloyd v. Insurance Co., 49 C. C. A. 11.

should she, in consequence, put into any port, other than that to which she is bound, the Port Charges and Pilotages at such Port shall be borne by the Steamer's Owners, but should the vessel be driven into port, or to anchorage by stress of weather, or from any accident to the cargo, such detention or loss of time shall be at the Charterer's risk and expense."

The defense of the respondent is stated in the answer as follows:

"Sixth. Further answering the libel herein, the respondent alleges that by reason of the stranding of the Steamship 'Avonmore' on the 11th day of April, 1903, she sustained very serious damage, and when finally floated, her bottom plating had been entirely perforated in several places to such an extent that No. 1 hold was practically flooded, and No. 2 hold, partly so. After said steamer was floated she made her way to St. Thomas where temporary repairs were made, but said repairs were not sufficient to render the vessel fit for service under the provisions of the charter party, and she was not in condition to load or discharge cargo without damage to same and was not in many ways tight, staunch, strong and fit. On account of this fact the Master deviated from the direct course to be as near as possible to land in case he was unable to control the leaks by the use of special pumps placed aboard at St. Thomas.

On said voyage to New York, the sugar cargo was still further damaged by reason of the leaky conditions of the steamer, and upon her arrival at that port all of the sugar stowed in No. 1 compartment had entirely melted; and the sugar stowed in No. 2 compartment was seriously damaged. By reason of the damage sustained to cargo in the No. 1 and No. 2 holds, the respondent was unable to collect a large part of the freight to which he would have otherwise been entitled. By reason of the damaged condition of the cargo, the discharge of the said steamer was also very seriously delayed at New York, and the respondent incurred extra expense. After, said discharge the steamer was dry docked and repaired at the port of New York, said repairs, as respondent is informed and believes, having required an expenditure of $48,000 before the steamer could be again put in a fit condition for service. Respondent has paid hire in full to the 11th of April, 1903, at 7 A. M. when the steamer stranded, and has refused to pay all hire since that date under the provisions of clause 15 of the charter."

The testimony shows, that on a return trip of the steamer to New York from Port of Spain, Trinidad, for which voyage she was subchartered by the respondent herein to the Trinidad Shipping and Trading Company, Limited, which had loaded her with a cargo of sugar in bags, stowed in the five holds of the vessel, she sailed from Port of Spain on April 9th, 1903, at 5 P. M. On the 11th, at 7 A. M., she stranded on the reef stated, which is on the westerly side on the Anegada Passage, owing to the existence of an uncharted westerly current which set the vessel out of her course and led to the disaster. After efforts were made to float the vessel by the use of her own steam and anchors, it was found necessary to place a part of the cargo in small boats and to jettison a considerable quantity, by which means the vessel was removed from the reef on the 16th of April at 10:30 A. M. The bottom of the vessel was seriously injured by pounding on the reef and she began to leak shortly after she stranded. When she floated off the reef she had 19 feet of water in the fore-hold and about 3 feet in the No. 2 compartment. She then proceeded towards St. Thomas, 45 miles distant, for the purpose of having the damage examined and to get assistance. She arrived there on the 16th of April, about 5:45 P. M., and was then about 2 feet by the head, but had no more water in her than when she started after the stranding, it having been kept down by pumping. When the harbor master at St. Thomas

learned that the vessel carried a foul bill of health, owing to small pox having existed at Port of Spain at the time of her departure from there, she was quarantined and all personal communication with the shore forbidden for eight days. At the expiration of such time, the master and chief engineer were permitted to go ashore but the vessel was not granted full pratique. Subsequently steps were taken towards holding a survey and it was recommended that the cargo be discharged as soon as practicable but the recommendation could not be carried out because nobody would work on the vessel owing to her foul bill of health.

On arrival at St. Thomas, the master cabled the position to the respondent but he gave no orders.

A subsequent survey was held by two ship masters, different persons from those constituting the first board, but the recommendation made by the last board that the vessel be dry docked for repairs could not be carried out and the master, having consulted the other officers of the steamer, including the chief engineer, concluded to proceed to New York. At this time the water in the fore-hold had been reduced from 16 to 10 feet. The water in the main-hold was being kept down to about 14 inches by pumping. Extra pumps were taken aboard, with men to work them, to assist the ship's engines, and the surveyors having had the assistance of divers who went under the bottom of the vessel and reported favorably as to her seaworthiness, concluded that she was in a fit condition to proceed with safety to her destination and gave a certificate to that effect. The pumps were set up in the holds and the vessel proceeded. At this time there were only 10 feet 3 inches in No. 1 hold and 4½ inches in No. 2. The other parts of the ship were dry. She was then drawing 22 feet aft and 16 feet forward. During the voyage, the pumps became somewhat choked at times, and although the hand pumps were kept working continually, the water increased in the holds, so that when she arrived in New York, she had 19 feet in No. 1 and 8 inches in No. 2.

Upon arrival at New York, May 6th, she was ordered by the respondent to a dock, and he provided stevedores and delivery clerks for discharging purposes. When the cargo was delivered in due course, the respondent collected $6,084.65 freight.

The vessel was then docked and her bottom repaired at a large expense, about $49,000, some part of which was probably due to injuries which could not have caused the leaks in the bottom.

The question to be determined is, whether the charterer was justified in refusing to pay hire for any part of the period from April 16th at 10:30 A. M., the time the vessel was removed from the reef after the stranding, and can appropriate for his own benefit the freight collected, without accounting in any way to the ship owner, to whom he denies that anything is due.

The respondent contends that the steamer was never in a fit condition for service after the stranding until the repairs in New York were made and that he was excused from paying any hire under the 15th clause of the charter party, which provided that in the event of loss of time from breakdown of machinery, stranding * * * damage preventing the working of the vessel for more than 24 running hours, the payment of hire should "cease" until she should "be again in an efficient state to

resume her service." He argues that the word "again" has a distinct meaning, because the contract provided in the beginning that the steamer should be placed at the disposal of the charterer "being on her delivery, ready to receive cargo, and tight, staunch and strong and in every way fitted for the service."

It is admitted by the libellant that the obligation of the charterer to pay hire ceased by reason of the stranding and it is argued by the respondent that unless she subsequently was in a condition to be tendered to him under the charter, the contract to pay hire did not again become operative.

On the other hand, the libellant argues with much force that as the vessel actually rendered services to the charterer, in bringing a part of the cargo home, payment should be made for it.

The determination of the controversy is difficult owing to the equity of the libellant's position but it must be determined according to the law. The case has been presented on the theory of hire being due, and resisted upon the ground that legally none was due.

The authorities seem to be with the charterer. It is apparently well settled that where the provisions of a contract of this kind have not been complied with by the owner of a vessel, there can be no recovery of hire, even though the charterer has had some benefit from her services in the carriage of the goods. The general doctrine will be found discussed in Parsons' Ship. & Admy. 319; Donahoe v. Kettell, 1 Cliff. 35, Fed. Cas. No. 3,980; Cook v. Jennings, 7 Durn. & East. 381, and Hogarth v. Miller, App. Cas. 1891, 48, 7 Aspinall, Mar. Cas. N. S. 1. In the last case, a charter containing a clause substantially like the one involved here was under consideration. The vessel there started on her return voyage from the west coast of Africa to Harburg on the Elbe. En route, her high pressure engine broke down and she had to put into Las Palmas in the Canary Islands. Eventually, the voyage was completed by the use of her low pressure engine and with the aid of a tug, which was partly paid for by the vessel. An action for the hire was instituted and allowed in the lower court, excepting one and a half days' detention from her damaged condition. On appeal to the Court of Session—16 Sess. Cas. (4th) 599—the judgment was reversed, the court holding that the ship was not in an efficient state and that the owner had no claim for hire after the accident, excepting for a part of the time occupied in discharging cargo at the place of destination. On appeal to the House of Lords, supra, the decision of the Court of Session was affirmed, excepting that the owner was allowed full time for the discharging on the ground that the ship was in an efficient state for that particular employment.

The libellant here divides his claim for hire into 4 parts: (a) The time occupied in proceeding from the reef where she stranded to St. Thomas, (b) the delay in St. Thomas, (c) the period of the voyage from St. Thomas to New York and (d) the period while the vessel lay in New York occupied with the discharging, claimed to be from May 6 at 11:30 A. M. until May 16 at 4 P. M., when she was delivered to her owner.

(a & b) The accident caused a deviation from the vessel's course to New York and what occurred during such deviation, is attributable to the disaster, which includes the voyage to St. Thomas and the deten-

tion there. The fact that the vessel was quarantined at St. Thomas on account of having come from an infected port has no bearing, although ordinarily the charterer is bound to furnish a clean bill of health. The Shadwan (D. C.) 49 Fed. 379; affirmed, sub nom. Donkin v. Herbst, 55 Fed. 1002, 5 C. C. A. 381. Here, it does not appear that the absence of such a bill would have made any difference, if the vessel had not deviated from her course on account of her injuries.

(c) During the voyage to New York, the ship was in a crippled condition and not entitled to hire under the contract. The libellant is not aided by the Harter Act, which was designed to modify the relations previously existing between vessels and their cargoes. The Delaware, 161 U. S. 459, 471, 16 Sup. Ct. 516, 40 L. Ed. 771.

(d) The time occupied in discharging in New York, however, is directly within the ruling of Hogarth v. Miller, supra, and the libellant is entitled to recover in such respect. If the parties can not agree upon the amount due hereunder, a reference may be had to determine it.

Decree for the libellant, with an order of reference.