FIELD et al. v. HAFNIA S. S. CO.

HAFNIA S. S. CO. v. FIELD et al.

(District Court, E. D. Pennsylvania. May 24, 1916.)

No. 27.

1. SHIPPING &⇒49(3)—CHARTERS—INTERRUPTION OF SERVICE—LIABILITY OF OWNER.

The master of a steamship under charter *held* not chargeable with negligence because of a fire which started in an extra coal bunker, on evidence showing that the coal was stored and cared for in the usual and customary manner, and the owner *held* not liable for the resulting damage to the charterer under an exception of fire in the charter party.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 194–196; Dec. Dig. &⇒49(3).]

2. SHIPPING &⇒40—CHARTER—TERMINATION BY FIRE—RIGHT OF CHARTERER TO PAYMENT FOR COAL.

By a time charter of a steamship the charterers were to leave 500 tons of coal in the bunkers on redelivery, for which they were to be paid a stipulated price. The vessel was damaged and rendered inefficient by fire, and withdrawn from the charter by the owner, having then in her bunkers coal in excess of 500 tons. *Held*, that the charterers were entitled to pay for 500 tons at the charter price, and for the remainder at the market price at the place where the charter was terminated.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. &⇒40.]

3. SHIPPING &⇒49(3)—TIME CHARTER—HIRE—DISABILITY OF VESSEL.

Where a fire disabled a steamship from further performing a time charter, and under its provisions terminated the contract, the owner is not entitled to recover hire after such time.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 194–196; Dec. Dig. &⇒49(3).]

In Admiralty. Suit by John W. Field and others, trading as William Haskins & Son, against the Hafnia Steamship Company, with cross-libel. Decree for libelants.

Howard M. Long, of Philadelphia, Pa., for libelants.

H. Alan Dawson, of Philadelphia, Pa., and Burlingham, Montgomery & Beecher, of New York City, for cross-libelant.

DICKINSON, District Judge. The above are cross-actions. The respective claims arise out of a charter party. The proceedings are in personam. The causes of action set up are, in the inverse order of the institution of the proceedings, in substance as follows:

The steamship claims for the agreed hire stipulated in the charter party, less an admitted deduction for hire from October 8 to October 15, 1911, amounting to $1,623.23. The charterers deducted hire to October 24th, increasing the amount deducted to $3,652.27. The difference, or $2,029.04, measures the amount of the claim. The libel in the one proceeding is by stipulation to be taken as the answer to this claim. The claim in the first case is by the charterers. It is for loss of the use of the ship through the act of the owners in withdrawing its service, and for time lost at two ports at which the ship touched, for

overpayment of the charter hire, and for coal of the charterers on board the steamship when withdrawn from their services. The aggregate of these claims approximates $50,000.

The defense to these counterclaims can be most succinctly stated in connection with the facts. The amount due for hire is undisputed, except that a larger deduction is claimed than the owners allow. The charter party contract was entered into June 24, 1911. The hire was £1,250, British sterling, per calendar month, and ratably for a part of the month. The hiring was for six calendar months from time of delivery; the place of delivery "a port in the U. S. Gulf," other than the ports excluded. Redelivery to the owners was to be made at "a port in the River Plate at charterers' option." Charterers were to pay for all coal in the steamer's bunkers at the current market price prevailing at the port of delivery, and were to leave 500 tons in the bunkers when the ship was redelivered, for which they were to be paid a stipulated price per ton. The charter party was of the usual printed form type, embodying the conditions and covenants ordinarily inserted. The special facts and the applicable provisions of the charter party are these:

The vessel was delivered to the charterers, and her charter hire began to run, August 4, 1911, with the vessel at Gulfport, Miss. She was there loaded, and proceeded thence on a voyage to Buenos Ayres, Argentine. On the way some crew trouble arose, and the vessel put in at St. Thomas, Danish West Indies. The trouble with the crew was there submitted to the authorities. As a consequence, some of the crew were left at St. Thomas. The vessel left that port September 13th, and proceeded on her voyage to Buenos Ayres, arriving in the outer harbor October 6, 1911. The captain went ashore to make arrangements for discharging the cargo. During his absence, the vessel took fire. The time of the fire is fixed as between 7 and 8 o'clock in the morning of October 8th. It started in an extra bunker just aft of the part of the cargo stowed through cargo hatch No. 2. It became necessary to flood the ship in order to control the fire. This, in turn, of course, necessitated the ship being pumped dry. The result was the ship did not reach the inner harbor until October 15th. Arrangement (interrupted by the fire) had been made to begin discharging October 9th. The result was that a discharging wharf was not secured until October 27th, and the work of discharging was not begun until October 30th. It was not completed until December 4th. Surveys were had and temporary repairs made to enable the vessel to get to a port at which she could be finally put in condition. She left Buenos Ayres December 16, 1911, stopping at Montevideo and Los Palmos for a renewal of her coal supply, and reached Wallsend January 20, 1912. Repairs were made there, and the vessel made ready to be again put in commission, March 6, 1912.

We observe in passing that the time limit of her hiring expired February 4, 1912. During the time the vessel was at Buenos Ayres, the charterers and owners conferred through telegrams, correspondence, and agents upon the subject of the disposition of the vessel. The view pressed by the owners then, as now, is that the charter was practically at an end. The charterers insist now, as then, that the vessel should

have been refitted for her charter purposes. As there were no facili-ties for making the needed repairs in Buenos Ayres, the vessel should have been taken to the most convenient port in the United States and put in condition to have taken on fresh cargoes. The claim of the charterers is that they had profitable use for the ship, of which they were deprived by the sending of her to the British Isles for repairs. One of their contentions is that the fire was due to the negligence of the ship; another, that she might have been repaired in the United States and some of her charter time saved to the charterers. An alternative claim is that, in any event, the allowance for deduction from hire should have been extended to include October 27th, and, under paragraph 16 of the charter party, a further allowance for deduction of about two days should be made for the detention of the vessel in going to St. Thomas. Still further deductions are asked because of the condition of the vessel after the fire, because of which she was delayed in dis-charging at Buenos Ayres. Claim is likewise made for 689 tons of coal, of an averred value of $7,118.75, which was appropriated by the owners. The loss sustained by the charterers was swelled by the fact that the charterers were compelled to secure the services of another ves-sel at an enhanced price. The reply of the owners to these counter-claims of the charterers is indicated with sufficient clearness in this statement of facts out of which the claims arise, except with respect to the claim for coal which will be considered by itself.

[1] 1. A convenient starting point in a discussion of the matters in controversy between the parties is in the consideration of the averments of negligence. These involve two assertions: One is that the coal was negligently stowed. The other is that the condition of the coal was not properly watched. The first finding of negligence asked relates to the coal in what is called the extra coal bunkers. More coal was tak-en aboard than the regular bunkers would hold. In consequence, a temporary bunker was improvised by partitioning off a portion of the cargo hold space for the extra coal. These partitions were of wood, so that no obstacle to the spread of the flames was provided. The second finding of negligence, if made, must rest upon the failure of the master to have the temperature of the coal taken from time to time. We are unable to find negligence. No discussion of the evidence is call-ed for beyond the statement of its negative effect upon the mind. The principles of law involved are admittedly the familiar ones that the coal was required to be so stowed and cared for as that no greater risk of damage was created than is ordinarily and in reasonable expectation present when what is done is done in accordance with the usages, cus-toms, and ordinary requirements of the conditions with which the man-agers of the vessel were confronted, and the evidence of what precau-tions, either in construction or management, might have been taken to minimize the danger, is fully met by the fact that the construction and management employed was the usual and ordinary construction and management known and adopted as adequate to meet the conditions of danger instant and prospective.

There was some evidence in the case which would have justified a finding that a safer construction might have been introduced to lessen

the danger of fire, and added oversight given to have prevented its spread by anticipating its breaking out. The finding would not be justified, however, that the precautions taken were not the usual and ordinary ones, and such as the usages, customs, and ordinary requirements of the business in hand demanded. This is aside from the further thought that fire was excepted from the charter party, and this included fire caused by negligence.

2. The second main point involved is whether the owner breached the covenants of his charter party in taking the vessel to Wallsend on Tyne. The hiring was for full six calendar months. For this length of time the vessel was at the disposal of the charterers. Had she become unfitted for use and repaired within the term, the charterers could use her when made efficient up to the end of the term, or under paragraph 5 of the charter party up to the end of her then uncompleted voyage.

It is admitted that, under paragraph 17, fire suspended the obligations of the contract, or annulled them, according to the fact of whether the efficiency of the vessel was restored within the time of the running of the contract. The fact of fire rendering the ship inefficient is asserted by both parties. The fact that repairs could not be made in Buenos Ayres is not disputed. The vessel was taken to Wallsend on Tyne, and not restored to efficiency until after the charter party had expired. There is no complaint of delay in what was done. The complaint is limited to the assertion that she might have been taken to a port of the United States and there sooner repaired. Unless, however, she could have been repaired in the United States before the expiration of the six months time limit, taking her to England did not affect the rights of the charterer. The whole question presented by this feature of the case turns on the fact, and the fact is found with the owner and against the charterer.

[2] This brings us to the claim for coal. The only defense urged is that it is not one of which admiralty will take cognizance, not being within the charter party, nor of the claims of the libel, or if, to be considered, the charterer is limited to the agreed price fixed by the charter party. To sustain the former position would require the drawing of overfine lines of distinction. The complaint is that the owners, in defiance of the charter party, resumed possession of the vessel, and along with her confiscated the coal of the charterers. The provisions of the charter party as to the effect of fire and as to the bunker coal relieve the owners from liability only for the time the effects of the fire lasted, and limited the coal price only up to the stipulated quantity. The charterers are entitled to recover for their coal 500 tons at $4.86 per ton, the agreed price, and 189 tons at $10.33, its undenied value, or $1,952.37, with interest from December 16, 1911.

[3] This brings us to the claim of the owners for hire. Recurring again to the charter party, the fact of fire suspended or annulled all the obligations of the contract. This relief is accorded to each of the parties. The fire took place October 8th. Its relief effect was in operation on October 24th as fully as on October 15th. The cross-libel is therefore dismissed. This is meant to dispose of the charterers' claim

for further allowances for the St. Thomas incident and the fire incident. We have spoken of the former as if the stop at St. Thomas was caused by the difficulty with the crew, or to have them reduced to subordination by the authorities there. The inadvertence is scarcely worth correction, but it is corrected by the finding that the trouble arose during the ship's stay in the port, and did not interfere with her navigation or affect the charterers. The allowance of deductions on fire account was made by the charterers, and the hire paid by them a voluntary payment made under circumstances which do not entitle them to recover back what they thus paid.

Formal decrees embodying these findings may be submitted.