## THE CANADIA.

(Circuit Court of Appeals, Third Circuit. March 26, 1917.) No. 2188.

1. ADMIRALTY ⊂⊃119—APPEAL—SCOPE OF REVIEW.

An appeal in admiralty from the District Court to the Circuit Court of Appeals opens the whole case for trial de novo in the appellate court, and the fact that one party did not appeal does not preclude the court from directing the entry of a decree more favorable to him.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 776–790.]

2. SHIPPING ⊂⊃49(3)—TIME CHARTER—LIABILITY FOR DELAY.

Under a time charter, which required the owner to furnish the crew and provided that hire should be suspended for time lost by reason of

deficiency of men, the charterer is entitled to an allowance for a delay of two days in a port because the crew drank to excess and became unruly.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 194–196.]

3. SHIPPING ☞40—TIME CHARTER—ALLOWANCE FOR COAL ON REDELIVERY.
Under a time charter requiring the charterers to leave 500 tons of coal in the bunkers, for which they were to receive a stated price per ton, they were entitled to pay for any excess over such quantity kept and used by the owner at the current market price at the port of redelivery.

4. SHIPPING ☞49(3)—TIME CHARTER—TERMINATION BY INJURY TO VESSEL.
After a vessel under a time charter and laden with lumber reached the port of destination, but before she docked a fire broke out on board, by which she was seriously injured and delayed for several days, after which she proceeded to her berth and unloaded. She was so badly damaged that she could not safely carry another cargo and could not be properly repaired during the charter term. The charter provided that hire should be suspended during time lost by reason of damage to the vessel. *Held* that the charter was not terminated by the fire, but merely suspended, and that the owner was entitled to hire during the time of discharging, but was justified in treating the contract as ended after the discharge was finished.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 194–196.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in admiralty by John W. Field and others, trading as William Haskins & Son, against the Hafnia Steamship Company, owner of the steamship Canadia. Decree for libelants, and respondent appeals. Modified.
For opinions below, see 234 Fed. 187, and 236 Fed. 599.

Howard M. Long, of Philadelphia, Pa., for appellant.
H. Alan Dawson, of Philadelphia, Pa., and Burlingham, Montgomery & Beecher, of New York City (Roscoe H. Hupper and Charles C. Burlingham, both of New York City, of counsel), for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. The Hafnia Company is a Danish corporation and owns the steamship Canadia. In June, 1911, the vessel was in New York and was chartered to the firm of William Haskins & Son for a term of 6 months from a future date of delivery at £1,250 sterling per month. Inter alia, the owner was required to furnish the crew, to pay for provisions, wages, stores, etc., and to maintain the vessel in a thoroughly efficient state in hull and machinery for and during the service. The firm was liable for the coal and other specified expenses, and agreed to pay the current market price for the coal in the vessel's bunkers at the beginning of the term, and was bound to leave 500 tons in the bunkers at the date of redelivery, the owner to pay 20 shillings per ton therefor. At the owner's option the monthly hire was to be paid in advance until her redelivery in good order and condition at a port in the River Plate to be chosen by the charterer. The cargo was to be loaded and discharged at such dock or place as the charterer should direct, on condition that the vessel could always safely lie afloat. If more than 24 consecutive hours should be lost by reason of deficiency of men, breakdown of machinery, or other damage, the hire should cease until the vessel should be

able to resume service; loss of time from accident to cargo or from other specified causes to be at the charterer's risk and expense. The act of God, fire, etc., were mutually excepted from the contract.

On August 4 the charterer took delivery of the vessel at Gulfport, Miss., and loaded a cargo of lumber for Buenos Aires. She set sail early in September, and a few days afterwards stopped at St. Thomas for coal. While there, some of the crew drank to excess and became so unruly that help from shore had to be called in, and for this reason the voyage was delayed almost 2 days. On September 13 she proceeded, and on October 6 reached the outer harbor of Buenos Aires. A berth was secured in the inner harbor, and in ordinary course the discharge of the cargo would have begun on the 9th. But between 7 and 8 o'clock on the morning of the 8th a fire (probably caused by spontaneous combustion) broke out in the coal that had been stored in the after part of No. 2 hold. This had been put on board by the charterer in New York, and was a reserve supply bought in preparation for the voyage and stored in a specially built compartment separated from the cargo by a wooden bulkhead. The fire was immediately and diligently attacked, but it spread as far as No. 1 hold, and finally compelled the sinking of the ship. After the fire had been thus extinguished she was pumped out, and on October 15 proceeded to the inner harbor, 18 miles distant. She could then have begun to discharge, but (owing to the regulations of the port in reference to damaged vessels and cargos) the berth previously secured was not now available, and no other was furnished until the 27th. Unloading began on the 30th, and continued without delay until December 4. While this work was going on, surveys were held which disclosed that serious damage had been done. Their details need not be given, as the parties have stipulated that the fire and the flooding had made permanent renewals and permanent repairs necessary, and that these could not have been completed at Buenos Aires or elsewhere in South America within the term of the charter, the reason being that proper materials and suitable machinery could not have been procured nearer than in the United States or in Europe. If made at Buenos Aires, such renewals and repairs would have cost at least £7,000 sterling. While the vessel was discharging, frequent letters and cable messages were sent by the parties, or their agents, but no definite agreement was reached. The charterer declined to give further orders until permanent repairs should be made, and at Buenos Aires no such repairs were feasible. The ship was not in condition to carry cargo safely, and finally the surveyors' recommendations were followed, she was repaired temporarily and sailed in ballast on December 16, bound for Wallsend in England. Some coal remained in her bunkers, but she was obliged to take on a further supply at Montevideo and at Las Palmas. She arrived at Wallsend on January 20, and the work of permanent repair was taken up and carried on without needless delay, but was not finished until March 6. Meanwhile, on February 4, the charter had expired.

The controversy here is over the allowance for three items: (1) The delay at St. Thomas; (2) the coal in the bunkers when the ship

sailed from Buenos Aires; and (3) the delay due to the fire. The District Court disposed of these matters in an opinion reported in 234 Fed. 187, where the libel and cross-libel are considered. Later a second opinion was filed, which will be found in 236 Fed. 599.

[1] The firm charges that the fire was caused by the negligence of the ship in several particulars, and a large part of the testimony has to do with this subject. We have considered but shall not discuss it, since we agree with the District Court in believing it to be insufficient to establish the charge satisfactorily. We lay aside, therefore, the question concerning the effect of including "fire" in the "mutually excepted" clause (Clyde, etc., Co. v. West India Co. [C. C. A. 2] 169 Fed. 275, 94 C. C. A. 551; Pool, etc., Co. v. Samuel [C. C. A. 3] 200 Fed. 36, 118 C. C. A. 264); and we lay aside also the question whether the charter exempts the Canadia from negligence, it being clear that she was not a common carrier. In other respects, the whole case is open on this appeal for our decision (Irvine v. The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175; Reid v. Exp. Co., 241 U. S. 548, 36 Sup. Ct. 712, 60 L. Ed. 1156); and in order to dispose of it on the merits we shall disregard several irregularities on one side and the other.

[2, 3] For the two days' delay at St. Thomas we think the owner should give the charterer credit. The ship was "deficient" in men within the fair meaning of the contract, and as the owner furnished and controlled the crew the owner is liable for their misconduct. In the prices fixed for the bunker coal that was used by the owner on the voyage to England, we agree with the District Court. The contract obliges the charterer to leave 500 tons of coal, for which a specified price is fixed; for the excess the owner was properly charged with the market rate at Buenos Aires.

[4] The principal dispute is over the allowance for the delay caused by the fire. We cannot agree to the proposition that the charter should be regarded as constructively ended on October 8. No doubt the payment of hire was suspended on that date, but in other respects nothing had happened to destroy the contract. When therefore the ship was able to resume movement and to carry the cargo to the inner harbor, the suspension ceased and the obligation to pay the hire revived. The ship was then fully able to do all that was required of her, namely, to carry the lumber to the place of discharge, and to conduct the work of unloading. She was not then being asked to receive a new cargo or to undertake a new voyage, and her fitness for service is to be judged by the immediate and the only task she was called on to perform. Hogarth v. Miller, [1891] L. R. App. Cas. 48. After this should be completed, the question would of course arise, What is she now able to do? and to this subject the parties addressed themselves while the cargo was being discharged. They did not agree, but the evidence satisfies us that the course pursued by the ship was reasonable, and indeed inevitable. Without permanent and extensive repairs she could not regain her classification, and she could not carry cargo safely. This was the master's opinion on the spot, and about such a matter his judgment is entitled to much weight. Besides, we

find no evidence that any cargo was at command for an outward voyage from Buenos Aires; naturally, while the parties were maintaining diverse views about what was possible to be done, not much effort would be made to obtain a cargo. Little if any time would have been saved by bringing the ship to the United States for permanent repairs, and we do not know whether any advantage in cost would have been gained thereby. As a whole, the evidence leaves us in no doubt that after December 4 the vessel could not have reached the United States and been permanently repaired in time to render further service under the charter. By necessity, therefore, the owner was justified in treating the contract as ended after the discharge was finished. From October 8 to October 15 the hire was suspended, but from the latter date until December 4 the charterer is liable.

The decree appealed from must be modified in accordance with this opinion, and it is possible that such modification may also affect the disposition of the costs. We therefore remand the case to the District Court with instructions to enter a new decree, in which the subject of costs may be further considered at the court's discretion. The costs on appeal to be paid by the appellants.