STEAMSHIP KNUTSFORD CO., Limited, v. BARBER & CO., Inc.

(Circuit Court of Appeals, Second Circuit. November 12, 1919.)

No. 21.

1. SHIPPING ⬅49(3)—INJURY WITHIN PROVISION IN CHARTER PARTY FOR DEDUCTION FOR LOSS OF TIME FROM BREAKDOWN OF MACHINERY, ETC., NEED NOT BE STRUCTURAL.

Where a charter party provided that, in event of loss of time from breakdown of machinery, stranding, or damage preventing the working of the vessel, payment of hire should cease until the vessel should be in an efficient state to resume service, it is not necessary that damage which prevented the working of a vessel be structural, in order to entitle the charterer to a deduction of hire.

2. SHIPPING ⬅49(3)—CHARTERER NOT ENTITLED TO DEDUCT FOR PERIOD DURING WHICH VESSEL WAS INJURED SO AS TO PREVENT WORKING WHERE TIME WAS USED IN DISCHARGING CARGO.

Where fire broke out in the hold of a vessel, which had to be flooded, and for that reason the cargo had to be removed and examined, *held* that, though the fire caused a buckling of bulkheads, and it was necessary to clean the holds, etc., before the vessel was again in a seaworthy condition, the charterer is not entitled to deduct hire during the period consumed in removing the cargo, etc.; and where the evidence did not show the length of the period after removal of cargo during which the vessel was unfit for service, a reference may be taken on that matter.

3. SHIPPING ⬅58(2)—BURDEN ON CHARTERER TO SHOW RIGHT TO DEDUCT HIRE DURING PERIOD VESSEL WAS UNFIT FOR SERVICE.

Where fire broke out in the hold of a vessel, and the cargo had to be removed, and the hold, which was flooded, cleaned, etc., the charterer has the burden of showing what period of subsequent delay was due to the inefficiency of the vessel, so as to entitle the charterer to take advantage of the provision of the charter party providing that hire should cease for the period for which the vessel was incapable of operation, etc.

4. SHIPPING ⬅49(3)—NO TACKING TOGETHER OF SMALL DELAYS, EACH LESS THAN TWENTY-FOUR HOURS, TO RECOVER DAMAGES.

Where charter party provided that hire should cease where the vessel was delayed for more than 24 hours, due to a breakdown of machinery, etc., the charterer cannot tack together several small delays, each less than 24 hours, so as to deduct a day's hire.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. SHIPPING ⊂⇒49(3)—CHARTERER NOT ENTITLED TO DEDUCT FOR INEFFICIENCY
OF MACHINERY WHICH LESSENED VESSEL'S SPEED.

A charterer is not entitled to deduct hire for inefficiency of machinery,
which lessened the vessel's speed, under a provision of the charter party
providing that hire should cease on the breakdown of the vessel, etc.

Manton, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the South-
ern District of New York.

Libel by the Steamship Knutsford Company, Limited, against Bar-
ber & Co., Incorporated. From a decree for respondent, libelant ap-
peals. Modified, unless respondent should choose to take a reference.

The libel was by the owner of the steamship Knutsford upon a charter party
entered into on March 11, 1915, by which the libelant let the Knutsford on a
time charter for two round trips—the first to the United States, Atlantic
Coast, then to the west coast of France not north of Havre; the second to the
west coast of France, not north of Havre, returning direct to West Kingdom
to be redelivered. The material portion of the charter party was article 16,
which read as follows: "That in the event of loss of time from deficiency of
men or stores, breakdown of machinery, stranding, or damage preventing the
working of the vessel for more than twenty-four (24) consecutive hours, pay-
ment of hire shall cease until she shall be again in an efficient state to resume
her service; but should the vessel be driven into port or to anchorage by stress
of weather, or from any accident to cargo, such detention or loss of time
shall be at the charterer's risk and expense."

The Knutsford made the two voyages in question, and the respondent paid
hire with certain deductions, which were the subject of the suit, and which
can be divided into three general classes: First, a deduction on account of de-
lays due to alleged breakdowns to machinery at sea between April 12th and
April 17th, totaling 1 day and 1½ hours. This deduction was made up of
five separate periods, the longest of which was 10 hours and 25 minutes. The
second deduction was for 2 days' hire for loss in efficiency of the machinery
by alleged damage. This loss was based upon the assumption that imperfect
working of the machinery between the 2d and the 19th of April caused a delay
of 2 days in the ship's arrival. The third deduction was for 7 days and
12 hours, from 7 p. m. on July 16th to 7 a. m. on July 24th. The ground for
this deduction was a fire which occurred on July 16th in the cargo stowed in
hold 2 forward of the engine room. The fire broke out on July 16th at 7:10 p.
m. and was put out at 4:40 a. m. on the 17th; but the hold remained flooded
until 7 o'clock on the evening of the 17th. The 18th was Sunday and there
is a dispute in the evidence as to whether the holds at that time were suffi-
ciently dry to permit the discharge of the vessel. In any event, nothing was
done until Monday, the 19th, when the captain began to shift the cargo from
this hold. This was of five kinds—sugar in bags, carbon, cases of machinery,
steel billets, and spelter. It did not appear how the cargo was stowed.

On Wednesday, the 21st, the sugar having been removed to the deck, the
captain employed a surveyor to examine the hold. He found that in a part of
the fore and aft steel bulkhead the steel plates had somewhat buckled, and
that a wooden thwartship bulkhead that had been used to divide off a part
of the hold for a reserve bunker had been burned and charred. He also found
that some hatch covers had been destroyed, some of the battens burned, and
the bilges, strainers, and suction pipes fouled and choked with melted sugar.
He recommended that the wooden bulkhead be removed, the cargo battens
be renewed, the charred portions of the ship's structure scraped clean, and
the bilges, etc., that were fouled by melted sugar, cleared. This was done by the
morning of the 23d, on which day the charterers, for their own purposes, built
a magazine in the ship to carry explosives. The question was what portion
of this time should be deducted in favor of the charterer.

The District Court disallowed the first two deductions, but allowed the third, upon the theory that during all the period after the fire the vessel had been damaged, so as to prevent her "working," within the language of article 16.

Charles R. Hickox and L. De Grove Potter, both of New York City, for libelant.

Harrington, Bingham & Englar, of New York City (D. Roger Englar, of New York City, and Vine H. Smith, of Brooklyn, N. Y., of counsel), for respondent.

Before ROGERS and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). [1-3] We quite agree with the learned District Court that within the language of article 16 it is not necessary that the damage should be "structural" in the sense that the frame of the ship must be injured, so as to prevent her "working." In this case the buckling of the fore and aft bulkhead was not such damage, and the charterer's right, under article 16, must rest upon the fact that the holds had to be cleaned before the ship was in seaworthy condition and that the charred bulkhead had to be removed. We further agree that the ship was not again in efficient state to resume her services until the morning of the 23d. Therefore, if article 16 had read that the charterer should not pay while the ship was in such a damaged condition as prevented her "working," we should have no difficulty in agreeing that during the whole of that period the hire ceased. However, in reaching such a result under the actual terms of this charter party, we should have to disregard the words, "in the event of loss of time," which were certainly intended to provide indemnity, if only partial indemnity, to the charterer. It follows that, if the cargo had been removed, not because of any damage to itself, but only to give access to the necessary repairs, then, as indeed Mr. Hickox admitted, all the time until July 23d would have been on the owner's account, but that, if the cargo had to be removed in any event for examination and restowage, the time taken for that purpose was not lost by reason of damage to the ship.

The evidence is far from clear, but it sufficiently appears that the sugar was taken out because it had to be. The hold had been flooded, and the charterer must examine and restow it before the ship could proceed. The same apparently was true of the cases of machinery, and possibly of the carbon, too, although the record is silent as to the last. But as regards the steel billets and the spelter it must be assumed that they were not injured. These being the circumstances, we think that the time necessary to examine and restow the sugar was not "loss of time" within the meaning of article 16, but that the charterer was using the ship at that time for a purpose which, though it necessarily delayed her, was still his own, and was not due to any "damage" to the ship. It seems to us that article 16 does not justify a deduction during that period, or until the charterer began to lose the use of the ship after he again wished to load her.

Had the spelter and billets been stowed at the bottom of the hold,

in such wise that it had to be discharged before the bilges, limbers, etc., could be cleared, or the charred remains of the wooden bulkhead removed, then the ship would have gone off hire in our judgment from the time the discharge of the cargo had reached the spelter and billets. The rest of the time would have been lost only because it then became necessary to remove that portion of the cargo to gain access to the damaged parts. It would have been upon the owner's account. So far as we can gather from the somewhat fragmentary proof, the last day lost because of the removal of the sugar was the 21st, on which the repairs began. The only question that can arise, therefore, is of the 22d, for on the morning of the 23d a certificate was given to the ship, showing that she was again "in an efficient state to resume her service."

The only evidence of what was done by the charterer on the 22d is contained in the testimony of the master, who says that cases of machinery were taken out for examination on the 21st and 22d. If this is to be understood as meaning that the 22d as well as the 21st were necessary for the purpose of examining the cases of machinery —some of which were later taken off the ship—the ship would not have been off hire at all. It is impossible upon such a meager record to tell whether this was the reason, or whether the unloading of the cases had proceeded in a leisurely way because in any case the ship must be laid up for repairs on the 22d. The burden of proof to bring article 16 into operation is upon the charterer, and on this record it, strictly speaking, fails to sustain that burden. However, since the decree is to be modified, a reference may be taken, if the parties cannot agree, to ascertain at what time on the 21st the charterer had completed so much of the discharge of cargo as was necessary for its examination before proceeding to reload, had the ship then been in an efficient state to resume her service.

As we have already indicated, all the time after 9 o'clock on the morning of the 23d we charge to the charterer's account. As held in Smailes & Son v. Evans & Reid [1917] 2 K. B. 54, the clause does not provide full indemnity to the charterers, but only until such time as the vessel is in efficient condition for "working." We are in full accord with the judgment of Mr. Justice Bailhache in that case.

Finally, there is the question whether the ship's holds were clear of water by 7 p. m. on July 17th, or whether the failure of the stevedore to work on the 18th was because they were not so cleared. The master says the holds were cleared, with the exception of some water in the bilges. The stevedore, Spillane, says that he did not believe the men would have gone into the holds on Sunday, the 18th. Yet at most there were only 6 inches of water on his own statement, and such a condition scarcely supports his belief. We think that the respondent has not borne the issue on this point.

In Hogarth v. Miller, [1891] A. C. 48, it was held that, while the ship was being used for discharge, she was on hire though she was not in fact efficient to resume her service, because her machinery was broken down. There the ship had broken down at Las Palmas, and was towed from there to Harburg, her first port of discharge,

where the charterer discharged her in part. The charterer was excused from paying hire during the period of the towage, and held during the period of discharge. The period of towage was not, indeed, lost time; certainly all of it was not; but the towage charge had been included as an expense in general average and was treated as a separate venture. We understand the case as meaning that the damage "prevented the working of the vessel," though possibly that is not wholly clear from the judgments delivered.

In Lake Steam Shipping Co. v. Bacon (D. C.) 129 Fed. 819, affirmed in this court without opinion in 145 Fed. 1022, 74 C. C. A. 476, the facts were substantially the same as in Hogarth v. Miller, except that the ship made port under her own steam in a crippled condition. The distinction regarding the towage charge above noted in Hogarth v. Miller seems not to have been observed, and it must be owned that the result is somewhat inconsistent in allowing a deduction for loss of time due to crippled power in steaming, while refusing to allow it for the period of discharge. Moreover, the allowance appears to us to be in face of the decision of the District Court here, which this court unanimously accepts, that the allowance is to be made only in case the breakdown prevents working of the vessel. However that may be, the allowance was refused during the period of discharge, and we see no distinction between that and the period of discharging the cargo for examination in the case at bar.

The Canadia, 241 Fed. 233, 154 C. C. A. 153 (C. C. A. 3d Cir.), squarely supports our ruling. In that case the vessel was held to be off hire during the period of a fire, but on hire while being discharged, though in an unseaworthy condition, being available for the purposes required by the charterer. We see no substantial difference between that form of expression and the one which we somewhat prefer; i. e., that the charterer has lost no time because of the damage.

The ruling reported in the note to The Santona (C. C.) 152 Fed. 520, made by Judge Choate while acting as arbitrator, does not seem to us to bear out the libelant's contention that a damage such as the Knutsford suffered did not bring her within the breakdown clause. We understand the damage in that case to have been altogether to the cargo, except for some slight repairs, which could safely have been postponed. We do not regard the damage done to the Knutsford as of that class, for, in spite of the master's statement to the contrary, the surveyor clearly did not think her seaworthy without some repairs.

[4, 5] As to the first point, we agree with the learned District Court that article 16 by its language precludes tacking together periods of less than 24 hours. We also agree as to the second point, that the vessel's reduced speed, due to the inefficiency of machinery, is not covered by the language "preventing the working of the vessel." These points are too obvious to require extended discussion.

The decree will therefore be modified, by allowing the owner full hire, unless the charterer shall choose to take a reference as above indicated. Costs of this appeal to the appellant.

MANTON, Circuit Judge. I dissent in part. I cannot agree with the prevailing opinion, in so far as it disagrees with the conclusions reached by the court below. The clause of the charter party which we are to consider provides:

"That in the event of loss of time from deficiency of men or stores, breakdown of machinery, stranding, or damage preventing the working of the vessel for more than 24 consecutive hours, the payment of hire shall cease until she be again in an efficient state to resume her service."

On the voyage in question, the loading had been going on for several days, and prior to 1:30 p. m. on July 16th the hatches were closed down, as further cargo was not available. At 7:10 on July 16th fire was discovered in No. 2 hold, which had been loaded with steel billets and machinery in boxes and sugar. The fire was put out at 4:10 a. m. on July 17th. The hold, at this time, was flooded to a depth of 14 feet 6 inches. A salvage boat pumped the water out, and this work was completed at 7 p. m. on July 17th. No work was done on the two intervening days, but on July 19th the stevedores, assisted by the crew, took the damaged sugar out of No. 2 hold, and this work was completed on July 21st. An examination revealed that the wooden bulkhead which partitioned off the reserve bunker space, was burnt out. After a survey, it was recommended that the wooden bulkhead and the battens be renewed; also that repairs be made to the sounding pipe, and that the bilges be cleaned out where possible. The bilges and strainers had been made foul, due to the sugar water and syrup. The work was completed on July 22d. On the 23d of July the charterers built a powder magazine in between decks, and on the 24th at 7 a. m. resumed the loading of the cargo.

The District Court held that the libelant could not recover for hire during the period after the fire in the vessel until reloading—that is, between July 16th, at 7 p. m. and the 24th, at 7 a. m.—and this because the damage caused prevented her working within article 16. During this period the ship was unfit for the service of receiving the cargo; that is, while the fire was raging, and until it was extinguished, the water removed, the hold repaired, and the pipes cleaned. We cannot read into this clause that the reason for the delay in loading cargo must be due to some damage of a structural character. Whether the damage was of a structural or nonstructural character is unimportant.

It is claimed, however, that the charterer's deduction of hire for the period referred to should be disallowed, upon the theory that during the period certain portions of the cargo were being shifted, and that the loss of time thus occurring was due to this cause, and not to damage preventing the working of the vessel, in the sense of the breakdown clause of the charter. This contention is untenable, because the interpretation of the charter party, upon which it rests, is irreconcilable, not only with the authorities, but it does not, when applied to the facts in the case, defeat the deduction of hire. Charter party provisions almost the same in effect—indeed, in hæc verba—have been held to authorize a suspension of hire for the period within which the vessel was not in a condition fit to perform the service required

of her, and this notwithstanding the fact that the charterer was able to and actually did make some use of the vessel during the period for the whole of which the deduction was sustained. To say that the loss of time here was due to cargo movements in which the charterer was interested, and not to the necessity for putting the vessel again in condition to resume her service, cannot be supported under the facts disclosed in this record. In the cases which are depended upon to support this claim, it will be found that the loss of time was due to other causes, and, in fact, there was not loss of time, or, at least, no loss covering the entire period for which the deduction was sustained. A controlling decision found in the English reports is Hogarth v. Miller, 60 L. J. P. C. 1, where the charter party provided:

"In the event of loss of time from * * * breakdown of machinery, want of repairs, or damage whereby the working of the vessel is stopped for more than 48 consecutive hours, the payment of the hire shall cease until she be again in an efficient state to resume her service."

In that case, the vessel put in at Las Palmas, owing to a breakdown in her engine. Thereafter a tug was sent out by the shipowners, under arrangement with the charterers, and the vessel proceeded with the aid of the tug, partly using her engines, to her destination, and there discharged her cargo. The Lord Ordinary held that the vessel was entitled to hire for the average period of the voyage from Las Palmas to the port of destination, and allowed a deduction only to the extent by which the duration of the voyage actually made with the assistance of the tug exceeded the duration of such average voyage. The House of Lords, however, held that the charterer was entitled to deduct the hire for the entire period of the voyage from Las Palmas to the destination. Lord Halsbury said:

"* * * The test by which the payment for hire is to be resumed is the efficient state of the vessel to resume her service; so that each of those words, as it appears to me, has relation to that which both of the parties must be taken to have well understood—namely, the purpose for which the vessel was hired, the nature of the service to be performed by the vessel, and the efficiency of the vessel to perform such service as should be required of her in the course of the voyage."

In Lake Steamship Co. v. Bacon (D. C.) 129 Fed. 819, affirmed 145 Fed. 1022, 74 C. C. A. 476, which is cited by the appellant, Judge Adams, in the District Court of New York, dealt with similar facts, and reached a like conclusion. The court held that the charter hire was suspended during the entire period of the vessel's voyage from St. Thomas to New York, although during that period she was carrying cargo for the carriage of which, on arrival at New York, the charterer collected a freight charge in a substantial sum. There the vessel left Port of Spain, Trinidad, for New York, on April 9, 1903. On April 11th, 36 hours later, she was stranded on a reef. She was removed from the reef on April 16th and proceeded to St. Thomas, 45 miles distant. She was there repaired, and went on to New York under her own power and unassisted, where she arrived in bad condition. It was held that the vessel was not fit for carrying service at any time after the stranding, and that hire was suspended from that

time until the vessel reached New York and was in a position to discharge cargo. The breakdown clause, construed in that case, was identical in wording with that in this case, and is undistinguishable in its effect. In each of these cases the suspension of hire was continued until the vessel was again in an efficient state to resume her services. The suspension of hire was held to begin when the vessel became unfit for her service, and that under the breakdown clause, in particular, the words used, "again in an efficient state to resume her service," meant that hire did not begin again until revived by the vessel again becoming efficient for the service required. Like authority may be found from a reading of The Canadia, 241 Fed. 233, 154 C. C. A. 153, and Olsen v. U. S. Shipping Co., 213 Fed. 18, 129 C. C. A. 607.

We should not construe differently the same language in this charter party of later date. The vessel was not fit to receive cargo while she was afire, or while the fire was being extinguished, nor while the hold was flooded; and she was not in an efficient state to resume her service until the repairs found necessary were completed. To say that it is incumbent upon the charterer to remove the cargo, because that was damaged, is ignoring the effect of the Hogarth v. Miller and Lake Steamship Co. v. Bacon Cases, supra. Moreover, it appears that through the period while the fire was in progress, while it was being extinguished, and while the vessel was being repaired and the hold cleared in consequence thereof, there was a loss of time from damage preventing the working of the ship, and if, during part of the time, the charterer was in fact shifting cargo for his own account, the fire and its consequences were nevertheless, throughout the entire period, a concurring cause of the loss of time. Here the vessel itself was actually on fire. There is no evidence to bear out the suggestion, made upon the argument, that it originated in the cargo. A consequence was the flooding of the hold, that created the need for shifting the cargo, all being occasioned by the fire, and also the necessity for repairs after the fire.

So far as the undamaged part of the cargo which was removed is concerned, manifestly there was no occasion to shift that, except for the damaged condition of the ship, and for the purpose of enabling the owner to make the necessary repairs to the ship. The portion of the sugar which had been melted and drawn into the suction pipes in the operation of the pumps, or deposited, mixed with water, upon the limber boards, had ceased to be of any interest to the charterer and no longer existed as a cargo. It was a total loss so far as the charterer was concerned. The clearance of this sugar, as of any other obstruction in the pipes or hold, was the duty of the owner, not the charterer, and the ship was not fit to proceed to sea until this, as well as the repairs, whether classified as arising from structural or nonstructural damage, had been made. It appears that some of the sugar had only been partially damaged, and still had value as merchandise. It was necessary to be shifted, in order to preserve or recondition it. The master, however, was obliged to remove this from the hold—that is, the sound as well as the damaged cargo—in order

to ascertain and repair the damage to the ship. Therefore all this work, including the movement of the cargo, was approximately caused by the fire, and the consequential damage by water, with its resulting damage to the ship. It seems clear to me, therefore, that the deduction of hire for this period was properly allowed by the District Court.

In reaching this conclusion, I do not overlook the decisions which have held that charter hire, after a period of suspension, begins to run again when the ship itself is fit for service, although certain consequences of the damage continue, involving actual loss of time to the charterer beyond the period during which the vessel itself is not fit for service. Small & Sons v. Evans, 2 K. B. 54, 33 T. L. R. 233.

Merely because one of the consequences of the unfitness is to require the charterer to perform some operation on his own account, it by no means follows that charter hire runs while the vessel is unfit. As in the case above referred to, the hire begins to run again because the vessel is "again in an efficient state to resume her service," not because the further period of delay is deemed not to be causally connected with the ship which suspended the accrual of hire.

For these reasons, I think the judgment of the court below is right, and should be affirmed.