## OLSEN v. UNITED STATES SHIPPING CO.

## UNITED STATES SHIPPING CO. v. OLSEN.

### (Circuit Court of Appeals, Second Circuit.   March 17, 1914.)

### No. 160

1. SHIPPING (§ 49*)—CHARTER—DEDUCTION FROM CHARTER HIRE—DELAY IN FITTING.

The owner of a ship, although chartered to carry lawful merchandise, was not required to remove permanent stanchions put in for the support of the deck and riveted in place to enable the charterer to load logs 60 to 70 feet in length which was not such cargo as the vessel was constructed to carry, and the charterer is not entitled to deduct from the charter hire for time lost during a dispute as to their removal.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. § 49.*]

2. SHIPPING (§ 53*) — CHARTER — DEDUCTION FROM CHARTER HIRE — EXPENSE CAUSED BY FAILURE TO LASH DECK CARGO.

Where the master of a chartered steamer after loading a part of a deck-load of logs at one port started for another loading port without lashing the forward deckload, in consequence of which some of the logs were thrown off, the ship was chargeable with the expense made necessary by such failure to secure the cargo before moving, which rendered her unseaworthy in that respect.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 214–218, 225; Dec. Dig. § 53.*]

3. SHIPPING (§ 49*) — CHARTER — DEDUCTION FROM CHARTER HIRE — LOSS OF FREIGHT BECAUSE OF CARGO JETTISONED.

It is the absolute duty of the master, although his vessel is loaded by the charterer to see that the loading is so done as not to render her unseaworthy when she starts on her voyage, and where a master did not do so but permitted a deckload of logs to be so loaded as to render the ship unstable and make it necessary to jettison some of the logs during the voyage, although no bad weather was encountered, the charterer which was not the owner of the cargo was entitled to deduct from the charter hire the freight lost because of the cargo jettisoned.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 187–200, 202; Dec. Dig. § 49.*

Deductions and offsets from charter hire of vessel, see note to Tweedie Trading Co. v. George D. Emery Co., 84 C. C. A. 254.]

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Andr. Olsen, as owner of the steamship Bergenhus, against the United States Shipping Company, with cross-libel. From the decree, both parties appeal.   Reversed.

For opinion below, see 195 Fed. 147.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham and Robinson Leech, both of New York City, of counsel), for appellant United States Shipping Co.

Haight, Sandford & Smith, of New York City (Charles S. Haight and John W. Griffin, both of New York City, of counsel), for appellee Olsen.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

WARD, Circuit Judge. These are cross-appeals from a decree in favor of the libelant Olsen, owner, and dismissing the cross-libel of the United States Shipping Company, charterer of the steamer Bergenhus. The charter party was in the government form dated June 24, 1909, for two specified voyages "to be employed in carrying lawful merchandise," steamer to be placed at disposal of charterer at New Orleans. The charterer ordered the steamer to Mobile and Gulfport to load timber on deck and under deck. The cargo tendered was square log timbers, many of them running 60–70 feet in length. The charterer loaded the cargo.

The claims in controversy are as follows:

The libelant's are for: (1) Amount deducted by charterer from charter hire for time lost at Mobile during a dispute as to the removal of stanchions. (2) Expenses resulting from the fall of the forward deckload at Gulfport and reloading at Ship Island. (3) Amount deducted by charterer from charter hire for detention at Newport News. (4) Expense of re-stowing cargo at Newport News and of surveys. (5) Amount paid holders of bill of lading for cargo jettisoned. (6) Expenses at Aberdeen in connection with the cargo jettisoned.

Cross-libelant's claim was for freight lost on cargo jettisoned.

Of the libelant's claims the district judge disallowed the first, divided the second, and allowed the third, fourth, fifth, and sixth. He dismissed the cross-libel.

[1] The charterer requested the master to remove the stanchions in the cargo holds on the voyage from New Orleans, but he did not do so. On arriving at Mobile he refused to comply with the same request. Some of the stanchions were riveted to the decks and some were only screwed in. The stanchions were necessary for the support of the deck, but some could be safely removed if the under deck cargo were so stowed as to support it and compensate for the removal of the stanchions. There is a dispute as to whether the charterer insisted upon the removal of all stanchions. However, the master was willing to remove those which were screwed in, but that would not have been sufficient for loading the long timbers. Four days were lost before the dispute was settled and enough stanchions riveted and screwed removed to enable the charterer to load the cargo.

We do not think the owners were obliged to cut out the riveted stanchions which were a permanent part of the structure. Timber was of course lawful merchandise, but logs 60–70 feet long were not such as the ship was constructed to carry. If she had been built with permanent transverse instead of longitudinal bulkheads, the charterer could hardly have insisted on those bulkheads being taken out in order to accommodate the long timbers. The charterer deducted four days' hire, which the District Judge allowed. We think this was error because the time lost was due to the charterer's unreasonable demand. See Keyser v. Duitt, 150 Fed. 328, 80 C. C. A. 212, and Mencke v. Cargo of Sugar, 187 U. S. 248, 23 Sup. Ct. 86, 47 L. Ed. 163.

[2] The steamer went from Mobile to Gulfport to complete her loading. There she lay at a berth in the stream which was entirely safe, although for part of the time, at least, her bottom was in soft

mud. The charterer loaded timber on deck both forward and aft. The after deckload was lashed by the crew but the loading of the forward deckload was not completed before dark, so that it could not be lashed that day. The charterer was anxious to have the steamer leave on the morning tide for Ship Island, to save a day, there being but one tide a day in the Gulf. The master accordingly moved the steamer astern to pick up her after anchor, without waiting to lash the forward deckload and in backing she struck the side of the bank. Some of the wooden uprights on the port side, fixed to keep the deckload in place, broke and twenty logs were thrown off. A survey was held which recommended that 279 more logs be discharged and the whole 299 logs rafted to Ship Island, to be reloaded there. The district judge held that the expenses connected with the falling of the deckload at Gulfport should be divided between the owner and charterer, the former being at fault for not lashing the deckload and the latter for loading it. We think that it is chargeable to the owners only because the master should not have started to Ship Island until he had secured the forward deckload. The accident was not due to the striking of the bank, but to the fact that the vessel was unseaworthy as to her forward deckload, a thing which it was the duty of the master to prevent.

When the steamer arrived at Ship Island all her ballast tanks were full except No. 2, the largest, which could not be filled because it was leaking as the result of injuries sustained in loading. There was a list of 13 to 14 degrees and the master refused to take on board the logs rafted from Gulfport. At the charterer's insistence, however, a survey was held which stated that the logs could be reloaded without affecting the seaworthiness of the steamer, and the master received them on board under protest. August 5th the steamer started from Ship Island for Aberdeen via Newport News for coal, with a list to port of 11 degrees which gradually increased to 22 to 24 degrees, although no heavy weather was encountered. The next day the master called a council of his officers which decided that it was necessary for the safety of all aboard to cut the lashings of the forward deckload and let some of it go. This was done and 300 logs went over the port side, doing considerable damage to the steamer. The remainder was secured and the steamer proceeded to Newport News, where the ship was repaired, the cargo restowed, coal taken on board and the voyage resumed. The charterer deducted hire for the detention at Newport News.

[3] The consignees of the cargo at Aberdeen sued the ship owners for the value of the cargo jettisoned, who, in pursuance of correct legal advice, paid the claim. The district judge allowed all these claims of the owners on the ground that they resulted from the improper loading, which was done by the charterer and which the charterer insisted did not affect the steamer's seaworthiness. This was, in our opinion, error. It is true that when charterers load cargo against the protest of the master in such a way that it is itself damaged and/or damages other cargo, the charterer will be liable. The Centurion (D. C.) 57 Fed. 412. Likewise, when cargo loaded on deck by agree-

ment is lost because of a peril of the sea the ship will be excused. Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58. We are not willing to extend this to such a loading as makes the ship herself unseaworthy when no sea peril is encountered. It would, in our opinion, be unwise and dangerous to impair the implied warranty of seaworthiness of the ship herself. The district judge rightly held that the steamer was unseaworthy on leaving Ship Island. The jettison was caused not by sea peril, but by her own instability. It makes no difference whether this was due to the amount or the stowage of the deckload alone or also to the fact that the largest ballast tank could not be filled. All these matters were under the absolute control of the master and it was his duty to see that they were right. It was no excuse to him that the charterers did the loading; insisted upon his taking the deckload or that surveyors certified that the ship could do so safely. No doubt both thought so. That, however, did not lessen his duty, especially in view of the fact that he did not think so himself.

The owners seek to sustain the decree on various grounds. They say that the warranty of seaworthiness was satisfied if the ship was seaworthy when the voyage began, which they say was at New Orleans, as she certainly was. If this be admitted, it will be no excuse to the owners if the master subsequently made or allowed others to make the vessel unseaworthy.

Then they rely on such analogies as landsmen requiring builders or manufacturers with whom they contract to use certain material or follow certain construction which results in loss. Such relations have no resemblance to the relation of vessel and cargo or to the supreme authority of the master of a ship. There is no such warranty as that of seaworthiness and the builder or manufacturer has no such absolute authority or duty as has the master of a vessel.

They rely also on article 30 of the charter providing that the deckload shall be at the charterer's entire risk, but this does not cover a risk caused by the unseaworthiness of the vessel.

Then they say that clause 9 in which the charterers indemnify the owners against any liability arising from the bill of lading entitles the owner to recover. But the bill of lading did not increase the liability of the owners under the charter party. Indeed it restricted it. The cargo did not belong to the charterers and if it did, the owner's liability for unseaworthiness would be exactly the same.

Finally cases are cited in which charterers were owners pro hac vice and therefore could not reclaim because of unseaworthiness caused by themselves. Obviously these have no application.

It follows from the foregoing that the claims of the libel, except for detention at Mobile, should have been disallowed and that of the cross-libel for freight on the logs jettisoned should have been allowed. The decree is reversed and both parties having appealed and succeeded, without costs to either of this court. Costs of the court below to follow the usual course.