### THE SANTA CLARA. *

### AMERICAN & CUBAN S. S. LINE, Inc., v. BEER, SONDHEIMER & CO., Inc.

(Circuit Court of Appeals, Second Circuit. April 17, 1922.)

No. 154.

1. **Shipping ⬦⟳44—Loading cargo of copper concentrates not within charter for carriage of "copper ore."**

"Copper ore" and "copper concentrates" are not interchangeable terms, but mean commercially two distinct and different things, and the loading by a charterer of a cargo of copper concentrates *held* not a compliance with the charter, which was for carriage of a cargo of copper ore.

2. **Shipping ⬦⟳44—Loading different cargo held material deviation from charter.**

Under a charter for carriage of a cargo of copper ore, loading by the charterer of a cargo of copper concentrates, of greater specific gravity and in a semiliquid or slushy condition, which made it more likely to shift than ore, *held* a material variation from the charter.

3. **Shipping ⬦⟳45—Charterer held responsible for improper stowage.**

While in general the master of a ship not under demise is responsible for the manner of loading, where the master of a vessel chartered to carry a cargo of copper ore, to be loaded by the charterer, was unfamiliar with such cargo, and a cargo of copper concentrates was loaded by the charterer, which was a large shipper of such cargoes, the master being told that it was ore and loaded in the customary and safe manner, the charterer and not the owner *held* liable for delay caused by improper stowage, which necessitated a return to port and rearrangement of the cargo.

4. **Admiralty ⬦⟳118—Trial being de novo on appeal, decree not reversible for error in excluding evidence.**

On appeal in admiralty the trial is de novo, and a decree will not be reversed for error in excluding competent testimony, where under the rules of the appellate court such testimony may, on application, be taken before the hearing in that court.

Manton, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

⬦⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 258 U. S. —, 43 Sup. Ct. —, 67 L. Ed. —.

Suit in admiralty by the American & Cuban Steamship Line, Inc., against 3,600 tons of copper ore in bulk, lately laden on board the steamship Santa Clara; Beer, Sondheimer & Co., Inc., claimant. Decree for libelant, and claimant appeals. Affirmed.

This case comes here on appeal from the United States District Court for the Southern District of New York. The District Judge decided in favor of the libelant, and a decree has been entered in the sum of $21,394.56, which includes damages, interest, and costs.

Harrington, Bigham & Englar, of New York City (D. Roger Englar, of New York City, of counsel), for appellant.

Baldwin & Curtis, of New York City (E. E. Baldwin and F. V. Barns, both of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This is a suit in rem, brought by the libelant, as sole owner of the steamship Santa Clara, against a cargo of copper ore in bulk, for an alleged breach of the charter party under which the cargo was shipped. It appears that on September 21, 1916, the libelant entered into a written charter party with the Copper Company, which was engaged in the mining and transportation of copper ores from the province of Oriente, in Cuba, to the United States. The Copper Company owned, operated, and controlled copper ore mines in the aforesaid province, as well as docks and facilities for the loading of its ores into vessels at Santiago de Cuba.

The Santa Clara arrived at Santiago, Cuba, in October, 1916, with a cargo of coal which was consigned to the Copper Company, and was discharged at its pier. The vessel then moved to a different berth at the same pier, and proceeded to take on board a cargo of concentrated copper ore, which was brought down the pier on an endless belt and dumped down the hatch through a chute. The chute was stationary, and when it was desired to change from one hatch to another, the vessel was shifted accordingly. The loading was begun on October 27, in No. 3 hatch, and continued until the following day, when the master stopped the loading on the ground that the cargo was too wet, and delivered to the charterer's representative a letter reading as follows:

"I beg to inform you that, owing to the extremely wet state of the copper ore you are shipping in the steamship Santa Clara, it is impossible to receive it, except you secure the cargo from shifting in the holds, by shifting boards, in a thoroughly efficient manner, so that the ship will be safe to proceed to the discharging ports. All lumber used for this purpose, and labor employed, to be at your expense."

The charterer thereupon sent to the vessel two lighter loads of lumber and a force of carpenters, who proceeded to install shifting boards. These shifting boards constituted a fore and aft bulkhead running the entire length of the ship. The bulkhead consisted of a double line of planks, with the hold stanchions between. There was also an athwartship wooden bulkhead put in No. 2 hold, to keep separate some 500 tons of crude ore which were to have been discharged at Norfolk. This crude ore was stowed forward of the athwartship bulkhead, by

which it was separated from the concentrated ore in the after part of the hold.

After the bulkheads were installed the loading was continued. All of the cargo, with the exception of some 40 tons, was put in the lower holds. The master signed two bills of lading, one of which covered 500 tons of crude ore and 43 tons of cement copper, which was destined for Norfolk, Va. The other bill of lading covered the remainder of the cargo, consisting of 3,100 tons of concentrated copper ore and 51 empty iron barrels. On the latter bill of lading, the master indorsed the following clauses:

"Not responsible for wet condition of copper ore or expense incurred thereby. Not responsible for rusty and damaged condition of iron barrels."

The shipper's representative protested against these indorsements, but his protest was disregarded by the master, and he was forced to accept the bills of lading in the form tendered to him.

The vessel sailed from Santiago for Norfolk on November 8, 1916, and in a few hours ran into an easterly gale of from 7 to 9 Beaufort's scale. The sea was rough and the ship was pitching. The ship, having rounded Cape Maisi and while proceeding on a northerly course, took a very heavy roll to port, giving the ship a heavy list. The master testifies that his vessel took a list of 15 degrees. The vessel put back to Guantanamo Bay. Before arriving there she had been brought very nearly on an even keel by filling the starboard engine room ballast tank and shifting the 43 tons of cargo which was in the between-decks. It was found on investigation that the cause of the list was a shift in the cargo in Nos. 1 and 2 holds. The ship was immediately turned about and proceeded under the lee of the land past the cape, and the turning of the ship and the consequent breaking of the waves on the port bow caused the ship to go back part way on an even keel. The starboard engine ballast tank was filled, and the copper cement in the barrels on the 'tween-decks was shifted, which having been done, the vessel proceeded to Guantanamo Bay, where she arrived about an hour after the shifting, and where she was then anchored and an examination of the cargo was thereupon made, which revealed that it had assumed a semi-liquid state and moved from side to side with the motion of the ship, and had seemingly changed in condition since the loading, and the top of it in said hold was covered with water. The survey of the vessel and its cargo was made by two United States naval officers, one appointed by the libelant and the other by the Copper Company. They recommended that the ship should proceed to Santiago and discharge the wet cargo. In compliance with that recommendation, the ship proceeded to Santiago, where she arrived on November 14th at about 3:17 p. m.

At Santiago another survey by a representative of Lloyd's and by one representing the ship was made, which likewise recommended that the wet cargo be discharged and reconditioned, and thereupon, with the full knowledge and consent of all parties, the cargo was shifted, part put in barrels between decks, part in barrels in lower holds 1 and 2, and dry ore from appellant's chute was poured in on top of the wet in 3 and 4. The reloading and the restowing of the cargo took about

8 days, and, when completed, a new survey was had, and thereupon the ship again put to sea, sailing this time for New York; the Norfolk stop having been eliminated by agreement. She arrived at New York without further incident.

It was found that, as a result of the shifting cargo, many of the shifting boards had been carried away, some broken, others carried to the surface of the cargo, and a number of the stanchions had been broken, a result expressive of the extreme mobility of the ore, and significant in comparison with the dry cargo of real copper ore in No. 2 hold, which had not changed and looked the same as when loaded. The loss of time involved, due to the shifting of the cargo, return of the ship, and restowing, amounted to 20 days.

The libelant sued for the detention of the steamship while putting back to Guantanamo Bay and Santiago, and for all the expenses of restowing the cargo and repairing the ship. The court below decided that the cargo was not copper ore in bulk in its usual and merchantable sense; that the acceptance by the master was induced by statements and representations which were untrue, although not in a wrongful or fraudulent sense; that the character of the cargo was dangerous, and the master did not and could not know it, and the condition of the cargo caused the list and subsequent damages and loss of time; and since the charterer was to do the loading, and did not furnish the cargo contracted for, the duty was upon it to load and stow in such a manner as to make the ship seaworthy.

A decree was entered on January 3, 1921, which adjudged and decreed that the libelant recover, from the claimant of the 3,600 tons of copper ore laden on board the Santa Clara, the sum of $17,164.42, the damages having been fixed by stipulation, with the interest computed in accordance with said stipulation, amounting to $4,100.19, and $129.95 costs, as taxed, making in all the sum of $21,394.56, with interest from the date of the decree. From the decree thus entered this appeal has been taken.

The appellant's position is: First, that the cargo laden on the Santa Clara was in fact copper ore, and that this fact is not open to question in the present state of the pleadings; second, that, even if the cargo were not copper ore, this fact would be wholly immaterial; third, that the difficulties of the Santa Clara arose entirely from the improper distribution of the cargo, coupled with the bad condition of her hold stanchions, and were not caused nor contributed to by any improper or unusual condition of the cargo; fourth, that the notice given by the master was not understood, either by him or the shipper's representative, as relieving the master of the responsibility of deciding how the cargo should be stowed; moreover, the master conceded that in fact he did not relinquish his control of the loading, but, on the contrary, he determined and directed the distribution and stowage of the entire cargo; fifth, that as a matter of law the master could not relieve himself of this responsibility.

The question whether the cargo laden on the Santa Clara was in fact copper ore was directly raised by the pleadings, and the contention to the contrary is frivolous, and cannot be seriously considered at the

present time. The assignments of error make no mention that the cargo was improperly described in the libel, and upon the trial claimant's counsel in no way suggested that the libelant's theory of the cause of action was not duly raised by the libel. The case was tried in the court below upon the theory that the Copper Company had contracted to deliver a cargo of copper ore in bulk, and that it had not complied with the agreement but had breached the contract; and no suggestion of surprise was made at any time by the claimant, neither was it suggested that evidence of the breach and the consequences thereof were not competent under the libel.

[1] The issue presented in this court, as in the court below, is as to whether the Copper Company delivered to the libelant the cargo as provided for in the charter party. The court below found that the cargo to be carried was copper ore, and that the cargo delivered was not "copper ore," but "copper concentrates." It appears that the charter shippers agreed to furnish the vessel with a full cargo under deck of "copper ore" in bulk; and we are convinced that what they furnished in fact was not "copper ore," but "copper concentrates," a very different material.

The term "copper ore" has a fixed and definite commercial significance, which is quite distinct from that of "copper concentrate," which also has a fixed and definite and different commercial significance. "Copper ore" is the raw material of nature; and "copper concentrate" is the product of any one of a number of forms of concentration processes. Neither commercially nor scientifically is there any confounding of the two terms. The concentrates are invariably more valuable than the ore, being the natural product after it has been mechanically treated. The mechanical operation involves important changes in the natural product. In the first place, it is pulverized, and converted from a solid, rocky condition to a fine, powdered condition. Then water or oil is added, and a chemical change takes place, so that the chemical analysis of the concentrates is different from that of the crude ore from which the concentrate is made, and there is a sifting out from the metallic content of the ore of the mineral waste content of the ore. It converts a noncommercial ore into a commercial product.

The last edition of the Encyclopedia Britannica (volume 20, p. 238), under the head of "Ore Dressing," says:

"When the miner hoists his ore to the surface, the contained metal may be either in the native uncombined state, as, for example, native gold, native silver, native copper, or combined with other substances forming minerals of more or less complex composition, as, for example, telluride of gold, sulphide of silver, sulphide of copper. In both cases the valuable mineral is always associated with minerals of no value. The province of the ore dresser is to separate the 'values' from the waste; for example, quartz, felspar, calcite, by mechanical means, obtaining thereby 'concentrates' and 'tailings.' The province of the metallurgist is to extract the pure metal from the concentrates by chemical means with or without the aid of heat."

It also states:

"The concentration of ores always proceeds by steps or stages. Thus the ore must be crushed before the mineral can be separated, and certain preliminary steps, such as sizing and classifying, must precede the final operations, which produce the finished concentrates."

It then proceeds at some length to describe more of the operations to which the ore is subjected.

The Century Dictionary defines "ore" as follows:

"1. A metalliferous mineral or rock, especially one which is of sufficient value to be mined. A mixture of a native metal with rock or vein stone is not usually called 'ore,' however, it being understood that in an ore proper the metal is in a mineralized condition—that is, exists in combination with some mineralizer, as sulphur or oxygen. The ore and vein stone together constitute the mass of the metalliferous deposit, vein, or lode. The ore as mined is usually more or less mixed with vein stone, and from this it is separated, as completely as may be convenient or possible, by dressing. It then usually goes to the smelter, who, by means of a more or less complicated series of operations, frees it from the worthless material which still remains mechanically mixed with it, and also sets it free from its chemical combination with the substances by which it is mineralized."

The same authority defines concentrate as follows:

"3. In mining, to separate [ore or metal] from the gangue or rock with which it is associated in the lode. See Dress, 5 (e)."

And that reference reads as follows:

"(e) In mining and metal, to sort or fit for smelting by separating and removing the non-metalliferous vein stone; as, to 'dress' ores."

The New Standard Dictionary defines "ore" as follows:

"A natural substance, sometimes forming part of a rock, containing one or more metals. The term is applied usually to a mineral from which the metal can be profitably extracted, but is sometimes extended also to non-metallic minerals, such as sulphur ore."

And the same authority defines "concentrate" as follows:

"3. Mining. To separate ore or metal [from its containing rock or earth]."

The libelant called two expert witnesses, who testified that the term "ore" in its ordinary commercial significance did not include a concentrate of ore. One of these witnesses was the professor of mining in the School of Mines of Columbia University, and who had held that position for 27 years. After stating that the term "ore" and the term "concentrate" each had a recognized significance in commercial understanding, he testified as follows:

"Q. What do you term, and what do you connote under the term, rather, of the word 'ore'? What do you mean by 'ore'? A. To give a definition of 'ore,' I should say that it is a mineral or a mixture of minerals containing one or more metals, precious or useful metals, and occurring in a natural form in such a quantity and chemical combination and grade as to make it possible to extract the metals with profit.

"Q. Well, when you use the term 'ore,' you mean a natural product, do you not, that has not in any way been treated? Is that what you mean when you use the word 'ore'—as it occurs in its natural state? A. I should make one slight modification before accepting that definition exactly. An ore is not necessarily in its original, natural state, in the sense that it may have been broken by hammers or otherwise.

"Q. With such modification, that is what you understand the term 'ore' means; is that it? A. Yes, sir.

"Q. Now, what is your definition of the term 'concentrate'? A. A concentrate is a product, resulting from the mechanical separation of the useful minerals or metals in ore from the associated gangue matter, or waste, as

it is called. The implication amongst mining or metallurgical people is that this product is the result of a mechanical treatment of some kind.

"Q. The two terms are not confounded at all, are they? A. No, sir.

"Q. And when you use the word, 'ore' per se, you do not involve in that in any sense the idea of a concentrate, do you? A. No, sir.

"Q. Now, the concentrate is a much more valuable product than the ore itself, isn't it, as a rule? A. As a rule; yes, sir."

The other witness was a graduate of the Royal School of Mines in Saxony, of 40 years' experience in mining, being an engineer by profession and the president of a number of companies engaged in mining. He had been a miner and a shipper of ores. Having stated that the term "ore" and the term "concentrate" each had a fixed significance commercially, he testified as follows:

"Q. So that, if you are using the term 'copper ore,' you claim that that has a fixed and established significance commercially? A. It is the raw material of nature.

"Q. It is the raw material of nature? A. Yes, sir.

"Q. And with reference to a concentrate? A. That is the product of a process. There are various forms of concentration process, three or four.

"Q. Commercially or scientifically, is there any confounding of the two terms? A. No; I think not.

"Q. In practice, when you speak of 'ore' per se, you refer to the product of nature? A. Yes, sir.

"Q. And a concentrate is that which has been mechanically treated in some way? A. In the commercial markets I have always found that there is a decided distinction made between them, the ore proper being the crude ore, or the natural product of nature, and any product from any process, the concentrates, would be one product, various sulphite residues from other processes would be other products, and in my experience, commercially, it has always been designated for each product sold.

"Q. Is that demonstrated in the commercial settlements? A. It appears on the settlement bills that accompany the checks.

"Q. But the distinction is always clearly drawn? A. Yes, sir.

"Q. The concentrate is much more valuable, is it not? A. You might say invariably more valuable, because that is the object of the process."

The claimant introduced certain testimony intended to show that the cargo carried was copper ore. One of the witnesses who so testified was a marine surveyor. Another witness, who said that he had been in business of a mining engineer "off and on for about 18 years," testified that the term "ore" included all the products of the ore, not only those directly handled from the mine, but also those which have been concentrated afterwards. And another witness, who said he had been in the business of a mining engineer for 25 years, but who held no degree from any institution, testified that "what I understand to be copper ore is any material containing copper." And still another witness, one for a number of years in the employ of the claimant, testified as follows:

"Q. As a result of your experience, will you tell us what is ordinarily included, among practical men dealing in or with copper ores, within the term 'copper ore'? A. Copper ore may be crude or dressed ore, or concentrated.

"Q. Are all those terms included within the general term copper ore; I mean, all those classes? A. Yes, sir; all those classes."

The court below, who heard and saw the witnesses who testified that copper concentrates are properly included in the term "copper ore," does not appear to have attached must significance to their testimony; and the majority of this court, having read the testimony in the record with care, have not been impressed with the accuracy of the opinions expressed by the witnesses who testify that "copper ore" and "copper concentrates" are practically interchangeable terms. As already indicated, we are satisfied that the terms "copper ore" and "copper concentrates" are not interchangeable, but mean two distinct and different things. The witnesses who testify to the contrary, while no doubt truthful, are simply mistaken, and not correctly informed.

[2] As to the second position taken by the appellant, that if the cargo were not copper ore the fact would be wholly immaterial, it may be sufficient to say that the appellant did not state, upon the argument or in its brief, the ground upon which its contention was based. We are unable to see why the character of the cargo as loaded is not material. The cargo furnished not being the cargo agreed to be furnished, and the fact of the difference not being known to the master, who was misled into accepting it by false representations made by the charterer's representative, the contract was breached, and in a very material matter. It took about 2½ tons of copper ore to make one ton of the concentrates. The specific gravity of the bulk carried was materially greater, and the cargo of concentrates was more mobile and less stable, and therefore more likely to shift than a cargo of copper ore.

A witness, testifying as to the character of this so-called "cargo of copper" which the charterer furnished to the steamship, stated that after the ship arrived at New York and was unloading he went on board to inspect it. The following are excerpts from his testimony:

"Q. How was the cargo taken out? A. Why, to my knowledge in buckets.
"Q. Did any men go down in the hold? A. Yes, sir.
"Q. They didn't just let a bucket down with a rope to dip this stuff up? A. No, sir; of course not.
"Q. Just what means did they use to put the cargo in the bucket? A. They scooped up the softest part of it with a bucket, and the harder part they shoved into the bucket."

After stating that he took samples of the cargo, he continued:

"Q. Could you walk around on top of this cargo? A. Not very well; no, sir.
"Q. What did you stand on when you got down in the hold? A. We dredged it from a ladder at the time.
"Q. What did you pick it up with? A. We got a stick to get the harder substance, and the softer we just scooped in.
"Q. With what? A. With the jar.
"Q. With the jar? A. Absolutely, sir.
"Q. I suppose there was more or less water or liquid around the top of this mass in spots, was there not? A. There was more water on top."

And he also testified:

"The Court: How would you describe the mass of cargo that you found in the ship's lower hold? What word would you use? Would it be fair to call it a mud or slush, or anything of that kind?
"The Witness: Your honor, it was more of a muddy substance, to my knowledge.

"The Court: What I am trying to get at is, what plain, common word would you use to describe it, whether you would say it was mud, clay, slush, or any such word as that?

"The Witness: I should think it would be something like a slush."

The third, fourth, and fifth of the positions taken by the appellant may be considered together.

[3] The libelant, as the owner of the steamship Santa Clara, is a private and not a common carrier, and it entered into a contract of affreightment with the Cuba Copper Company. The charter party which the parties to the agreement signed was in the ordinary form and did not amount to a demise of the ship. The libelant as general owner of the steamship retained the possession, command, and navigation of the ship, and simply agreed to carry a cargo of copper ore to the ports specified, which cargo the Copper Company agreed to furnish and to load and discharge free of expense to the ship and her owners.

There is no doubt that the cargo which the ship carried was originally improperly stowed. It was what is known as dead weight cargo, and there is testimony indicating that the whole of a dead weight cargo cannot properly be put in the bottom of a ship, and that a considerable portion of such a cargo should have been placed in between-decks of the vessel. If the whole cargo is placed in the lower hold, and the ship encounters heavy weather, and the vessel starts rolling, she will not work properly and is too stiff. If the ship is so loaded as to make her too stiff, as one of the witnesses expressed it, "she's like a rock— she doesn't give." And the testimony shows that putting too much of a dead weight cargo in the bottom of the ship tends to cause a shifting of the cargo in heavy weather. But in this case all of the cargo, with the exception of some 40 tons, was originally put in the lower holds. And when the ship on her voyage to Norfolk rounded Cape Maisi and was proceeding on her northerly course, she ran into a rough sea and took a heavy roll to port, giving her a 15 degree list. The cause of the list was found to be a shift in the cargo in Nos. 1 and 2 holds. She put back to Guantanamo Bay, where a survey was made, and it was recommended that the vessel should proceed to Santiago and discharge the wet cargo." On her return to Santiago some 500 or 600 tons were shifted to the between-decks, most of which was put in barrels. When she resumed her voyage after this change in the method of stowage, there was no further trouble. So that we are brought to a crucial question as to who is responsible for the original faulty stowage.

It is said that the master of the steamship, as the libelant's agent, accepted the cargo of concentrates, and must be presumed to have stowed it to suit himself, and, since he got into trouble by reason of bad stowage, the owner, and not the charterer, is responsible for the pecuniary damage. Under the terms of the charter, the charterer agreed to load the cargo. We do not question that it may be the absolute duty of a master ordinarily, even when his ship is loaded by a charterer, to see that the loading is so done as not to render her unseaworthy when she starts on her voyage. This court so held in Olsen v. United States Shipping Co., 213 Fed. 18, 20, 31, 129 C. C. A. 607, 610. In that case

it was found necessary to jettison some of the logs loaded on deck by the charterer, and which were so loaded as to render the ship unseaworthy when she started on her voyage, so that she was made unstable and made the jettison necessary, although no bad weather was encountered. We allowed the charterer, which was not the owner of the cargo, to deduct from the charter hire the freight lost because of the cargo jettisoned. We said:

"The jettison was caused not by sea peril, but by her own instability. It makes no difference whether this was due to the amount or the stowage of the deck load alone, or also to the fact that the largest ballast tank could not be filled. All these matters were under the absolute control of the master, and it was his duty to see that they were right. It was no excuse to him that the charterers did the loading, insisted upon his taking the deck load, or that surveyors certified that the ship could do so safely. No doubt both thought so. That, however, did not lessen his duty, especially in view of the fact that he did not think so himself."

But we do not think the principle announced in that case applicable to the facts of the case now before the court. The circumstances of the two cases are very different. In the Olsen Case the cargo loaded on the steamer was a cargo of a character with which the master was entirely familiar. It was a safe cargo, the character of which was as well known to the master as to the charterer, and it was a cargo which the owner had agreed to carry. In the instant case the master, who had never carried a cargo of copper ore, was not tendered such a cargo, but one of concentrates, and the master was falsely told that it was a cargo of copper ore. He feared that the cargo tendered was not a safe cargo, but was assured that it was safe and one commonly carried by all ships. He questioned the manner in which the charterer was stowing it, and was assured by the charterer's superintendent that it was being stowed in a safe manner and in accordance with the manner of stowing on all ships which the charterer loaded. But the master continued to concern himself in protecting the safety of his ship, and at an early hour on the morning of the second day of the loading he informed the charterer's superintendent that he would not consent to take on board any more of his cargo "unless they fixed it up with shifting boards, so that the ship would be seaworthy," as he thought the cargo was not stable enough. This is an excerpt from his testimony:

"Q. Did Mr. Cappe say anything in answer to your statement? A. He said that the cargo would soon come drier; they had a lot of dry cargo they were putting in the bins.

"Q. What else, if anything, did he say? A. He said they had been shipping it more or less this way for a long time, and no other ships carried shifting boards, but he would give them to me if I insisted upon it.

"Q. Did you insist upon shifting boards? A. Yes. * * *

"Q. Did you have any assurances as to the propriety of the manner in which the cargo was loaded, as being capable of withstanding the voyage? A. Yes.

"Q. From whom did you receive those assurances? A. From Mr. Cappe.

"Q. And what were those assurances in substance? A. That they had been shipping this cargo in a wet state for four years, more or less; that other ships were taking it aboard. He seemed to know that it was a seaworthy cargo, and that all ships coming up from New York with a cargo have a certain amount of water on top.

"Q. In answer to a question put by counsel to the effect or in substance, did you ever ask for anything you did not get? A. Except one suggestion, that they ship it in barrels.

"Q. Did you suggest that to Mr. Cappe before the cargo was loaded? A. Yes.

"Q. What did he say to that? A. He took it as a joke."

The assurance given by the charterer's superintendent persuaded the master to accept a cargo of concentrates as a cargo of copper ore, and led him to believe that his ship had been safely loaded and was safe to proceed to sea. The master of a ship chartered to carry a cargo of copper is not required to be an expert in copper concentrates, or in the loading of his vessel when misled as to the character of the cargo, and when informed that the cargo actually received has been loaded in the usual manner for carrying the cargo, and when it has been agreed that the charterer shall load.

While a cargo of copper concentrates is not inherently dangerous, its characteristics are such that there seems to be greater danger to be anticipated from its improper stowage than is the case when the cargo consists of copper ore. This we think appears from the testimony of one of the experts produced by the libelant, who testified as follows:

"A. The natural joggle of any concentrate in any form of transit would tend to solidify it in the very lowest compartment, and progressively upwards it would run into a movable mass on the top; it would be pulpy and muddy, but it would be a mixture on top, and the water works toward the top, because lighter, and as much oil as is left in goes in also, and in that traveling, every time there was a list, the moisture would act as the conveying medium to slough off this material and take it off to the lowest side, and, if the swing did not swing regularly all the time, but works toward one side all the time, it would tend to pack itself up, just like the waves will wash up sand on the seashore, on that side, and, when a movement in the ship came, the water would come back first, but the packed stuff would come back slower, so that you would have the heavy concentrates on the list side of the ship, and the lighter material, the water, would travel to the other side, but for some time this stuff would not come over, if at all.

"Q. But that would not be true of the ore? A. Not in any sense at all, unless the angle was very much greater, and the whole thing went over, and then the ore would come back, because it would not be spread out and compacted so from the action of the water.

"The Court: That means that the ore would tumble around like rocks, and the concentrate would move around like mud?

"Witness: No; it begins to pack up on one side more than the other, and the water would go the other way, because, when the water goes, the concentrate stays, because the concentrate is the heavier."

In the case of Pierce v. Winsor, 2 Cliff. 18, 19 Fed. Cas. 646, No. 11,150, the charter was, as here, for the whole ship, but was not a demise. The charterers had shipped a cargo whose dangerous character was unknown to the master, and Circuit Justice Clifford held that any loss which arose from the character of the cargo should fall upon the charterer, who was possessed of knowledge which, if imparted to the master, might have avoided the loss. The particular cargo involved was mastic.

"When delivered on board it was in cakes, and was stowed in bulk in the run. Upon the arrival of the ship at the port of destination, it was found that the mastic had melted on the voyage, and that the cakes had contact with it, and had hardened as alleged in the libel, and in that state was adhering

to the sides of the ship and to certain portions of the cargo. The amount of damage done to the cargo, which was paid by the master, on account of the ship, including the extra expense in discharging the mastic, exceeded $1,900."

In that case the charterer was held responsible for the loss occasioned by the melting of the mastic, and recovery allowed, although the shipowner did not charge the shipper with knowledge of the dangerous character of the cargo, but based its right to recover on the general implied warranty that the shipper was obliged to furnish a safe cargo.

In such a case as the one now before the court, it seems just and expedient that the loss occasioned by the improper loading should fall upon the charterer, rather than upon the shipowner. In Brass v. Maitland, 6 El. & Bl. 481, the owners of a ship undertook to receive the goods and safely carry and deliver them at the destined port. The defendants shipped a corrosive substance packed in casks and delivered it to the plaintiffs to be carried in the ship. The corrosive substance escaped from the casks and destroyed the cargo. The plaintiffs received the casks, not knowing the dangerous character of the contents. The court held that there is an implied undertaking on the part of the shippers of goods on board a general ship that they will not deliver to be carried on a voyage packages of a dangerous nature, which those employed on behalf of the shipowner may not on inspection be reasonably expected to know to be of a dangerous nature, without giving notice. In the course of his opinion Lord Chief Justice Campbell said:

"It seems much more just and expedient that, although they (the shippers) were ignorant of the dangerous quality of the goods or the insufficiency of the packing, the loss occasioned by the dangerous quality of the goods and the insufficient packing should be cast upon the shippers than upon the shipowners."

It is quite true that copper concentrates are not a cargo inherently dangerous; but where the charterer misleads the master of the ship as to the nature of the cargo he is loading, and assures him that the cargo is loaded in the usual manner that such a cargo is loaded and safely carried, and where the charterer has been informed by the master that it is impossible to receive it, "except you secure the cargo from shifting in the holds, by shifting boards, in a thoroughly efficient manner, so that the ship will be safe to proceed to the discharging ports," the damages resulting from the improper loading should fall upon the charterer, and not upon the shipowner. It seems that after such a notice the master, and therefore the libelants, whose agent he was, had the right to rely on the charterer's loading of the cargo which they understood and he did not. The conclusion reached seems, under the circumstances, as just and expedient as that reached in Brass v. Maitland, supra.

[4] Before bringing this opinion to an end, it is proper to refer to another point. The twelfth and sixteenth assignments of error relate to certain rulings of the trial judge in the exclusion of evidence. The sixteenth of these assignments of error involves a number of rulings and covers nearly 3 pages of the printed brief. An appeal in admiralty is a new trial, and, if evidence was improperly excluded below, the appellant was entitled to apply to this court to have the excluded testi-

mony taken under rule 6 of the Rules of this Court in Admiralty, which reads as follows:

"Upon sufficient cause shown this court or any judge thereof, may allow either appellant or appellee to * * * take new proofs. * * *"

And such testimony may be taken by deposition before any United States commissioner or notary public upon reasonable notice in writing being given to the opposite party. Rule 8. No such application was made, and as the case stands, if testimony was improperly excluded at the trial, it constitutes no ground for reversal. In Moran Towing & Transportation Co. v. Cranford Co., 274 Fed. 799, we declared that:

"This court will not reverse a decree because of error in excluding competent testimony in an admiralty case, for that would presuppose that the testimony offered would have actually proved the point sought to the satisfaction of the court. If counsel felt aggrieved by the exclusion of this testimony, they could have moved before this court to take such testimony, for in an admiralty suit on appeal there is a trial de novo."

The decree is affirmed.

MANTON, Circuit Judge (dissenting). The charter party under which the steamship Santa Clara was loaded with the ore in question provided:

"That it should receive a full cargo under deck of copper ore in bulk of about 3,500 tons, of 2,240 pounds," from Santiago, Cuba, to Norfolk, Va., and/or New York.

The loading began on October 27, 1916, in No. 3 hatch, and continued until the following day, when the master stopped the loading because he said the cargo was too wet, and he delivered a letter to the charterer's representative reading as follows:

"I beg to inform you that, owing to the extremely wet state of the copper ore you are shipping in the steamship Santa Clara, it is impossible to receive it, except you secure the cargo from shifting in the holds, by shifting boards, in a thoroughly efficient manner, so that the ship will be safe to proceed to the discharging ports. All lumber used for this purpose, and labor employed, to be at your expense."

Thereupon a force of carpenters proceeded with the necessary lumber to install shifting boards under the direction of the master. This work was completed, and resulted in a fore and aft bulkhead running the entire length of the ship. The bulkhead consisted of a double line of planks, with the hold stanchions between. There was also an athwartship bulkhead put in No. 2 hold, to keep separate some 500 tons of crude ore, which was to have been discharged at Norfolk. This crude ore was stored forward of the athwartship bulkhead, by which it was separated from the concentrated ore in the after part of the hold. Heavy rains fell on the first ore loaded, which was put in hatch No. 3, and this resulted in a greater percentage of moisture than is usually found in such ore. But the ore put in the other hatches was much drier than that put in No. 3 hatch. It was the ore loaded in No. 3 hatch which is the subject of the master's complaint. All the cargo, with the exception of 40 tons, was put in the lower holds. The master signed two bills of lading, one of which covered 500 tons of crude ore and 43

281 F.—47

tons of concentrated copper destined for Norfolk. The other bill of lading covered the remaining cargo of 3,100 tons of concentrated ore and 51 empty iron barrels. Upon this bill of lading the master indorsed the following:

"Not responsible for wet condition of copper ore or expenses incurred thereby. Not responsible for rusty and damaged condition of iron barrels."

Protest was made as against these indorsements, but this protest was disregarded by the master, and the bills of lading were accepted in the form tendered. The vessel left Santiago on November 8th. The master testified that at 6 p. m. that night the wind was freshening and the sea rising. At 8 p. m. there was a gale, with a rough sea, the velocity of the wind increased, and the rough, heavy sea resulted in the ship pitching. The ship listed about 15 degrees, and upon investigation it was found that the cause of the list was a shift in the cargo in Nos. 1 and 2 holds. The vessel put back to Guantanamo Bay, but before arrival she was brought nearly to an even keel by filling the starboard engine room ballast tank and shifting the 43 tons of cargo which was in the between-decks. It was admitted that when the vessel arrived at Guantanamo Bay there was a list of some 4 or 5 degrees. The vessel then returned to Santiago, where it was found that a number of stanchions on which the shifting boards had been secured were torn away, the top of the cargo was in a wet and plastic condition to a depth of some 2 feet, and there was stiff clay which extended to the bottom and was perfectly stable. It was necessary to remove a considerable part of the cargo to repair the stanchions, and there were some 500 to 600 tons shifted on the between-decks, most of which was put in barrels. Then an additional 120 tons of concentrated ore was loaded from the chutes of the Cuba Copper Company. After repairing the stanchions and shifting the cargo, the vessel sailed for New York and arrived at her destination without further mishap.

This suit is for detention of the steamship while putting back to Guantanamo Bay and Santiago and the expense of restoring the cargo and repairing the ship. It is apparent, from reading the libel and from the testimony offered on behalf of the libelant, that the complaint of the libelant was that the cargo was unduly wet or liquid and contained an undue percentage of oil, and liability was thus sought to be imposed upon the ship, upon the theory that concentrated ore was not copper ore in bulk.

As the term "copper ore in bulk" is commercially used, it was testified to by at least three witnesses to include concentrated ore or hand-picked ore. In mining, the term "concentrate" means to separate ore or metal from the gangue or rock with which it is associated in the lode. Century Dictionary.

I am satisfied that the preponderance of the evidence is to the effect that concentrated ore is included within the phrase "copper ore in bulk," as that is understood in the trade. This was the testimony of men who are familiar with the trade understanding of that phrase. The appellant sought to prove the previous course of dealing between the parties, which promised to show that the parties themselves understood the term "copper ore in bulk" to include concentrated ore; that

is, to show that the concentrates of ore were carried theretofore by the libelant's vessels under the designation of "copper ore in bulk." Although this testimony was excluded, there is evidence elicited on cross-examination of Capt. Lee, called by the libelant, as follows:

"Q. Now, you say that other ships of the said libelant's line had carried cargoes of this similar ore from Cuba to the United States? A. Yes.

"Q. So that, when Mr. Cappe told you that, it was true wasn't it? A. Yes."

The charterer's knowledge of the character of the ore produced by the Cuba Copper Company, at the time it entered into the charter party, is established. Evidence of this character explains the sense in which the parties to the contract of charter understood the terms "copper ore in bulk." Reed v. Insurance Co., 95 U. S. 23, 24 L. Ed. 348; Thorington v. Smith, 75 U. S. (8 Wall.) 1, 19 L. Ed. 361; Raymond v. Tyson, 17 How. 53, 15 L. Ed. 47.

After changes were made by the appellee, and the bulkheads were built, the captain accepted the cargo and proceeded to sea. There is testimony in the record that improper distribution of the cargo and the bad condition of the hold stanchions did, in point of fact, cause the damage. There was evidence to show that the stowage was improper, and made the vessel unduly stiff, with the result that the cargo was likely to shift as soon as the vessel encountered a rough sea, and it was after the rough sea was encountered that the list was found. When the vessel went back to Santiago, the principal change consisted in shifting 500 tons of cargo on the between-decks. The log shows that she encountered bad weather on her second, as well as on her first, voyage from Santiago; but she came through the second time without difficulty, and on this occasion there were no shifting boards in the hold. It appears that the cargo, as originally laden on the vessel, was retained on board with the exception of some 1½ or 2 tons of water, and the only additional cargo taken on board was about 120 tons of concentrated ore in the same condition as that which had been loaded originally. Capt. Lee testified that, when the vessel sailed from Santiago the second time, he considered her safe and seaworthy, and her safe arrival justified him in this belief.

The explanation for her being more seaworthy on her second departure is due to the fact of the shifting of the cargo on the between-decks, and perhaps stabilizing it by putting part of it in barrels. It is clear to me that the shifting of the cargo on the first voyage is sufficiently accounted for by the fact that it was not properly distributed. There was also testimony that the hold stanchions were carried away, because they were of old material and of an old type, not used in modern ships. There is nothing in the fact that the ore may have been wet, or had an undue amount of moisture, which would justify the conclusion that it was dangerous or even difficult to transport. Cargoes of like character had been shipped for some four years previous, and it was not found necessary to install even shifting boards. The fact that moisture had collected on the top and wet the surface of the cargo did not make it dangerous, and there is no pretense that any of the cargo was unusually wet, except that which was first stowed in hold No. 3. There was no shifting of the cargo in this hold. When ballast was supplied, after she

took a list, it was found that she entered the harbor of Santiago with a very trifling list, and it was testified by most of the witnesses (except the captain) that they did not notice that the cargo had shifted. This would negative the idea that a large tonnage of the cargo shifted.

The notice of the captain, complaining of the wet state of the ore, asked that shifting boards be put in a thoroughly efficient manner, and this was done under his supervision. The subsequent indorsement on the bills of lading as to nonresponsibility for the wet condition of the copper ore, or expenses incurred thereby, should not be construed so as to refer to the expenses arising from unseaworthiness of the ship on sailing. Assuming that the ore in question, because it was concentrated ore, was something different than copper ore in bulk, I fail to see how that would alter the obligations as between the shipper and shipowner in respect to loading and stowage of the cargo and unseaworthiness of the ship. The master did not refuse to accept the ore as copper ore in bulk, and when he did receive it the ship owed all the obligations fixed by the maritime contract for transportation. It is a very different situation than one which is created where a dangerous or explosive cargo is unwittingly taken on board, or there is some concealment from the master.

Because I think the cargo was accepted for transportation as it was and as seen by the master, the appellant should be relieved of the decree, and the decree below should be reversed.