**R. T. JONES LUMBER CO., Inc.,**
**Libellant,**

v.

**ROEN STEAMSHIP COMPANY and THE BARGE HILDA, her boats, engines, tackle, etc., Respondents.**

**No. 2268.**

United States District Court
W. D. New York.

Sept. 18, 1957.

Coffey, Heffernan & Harrison, Buffalo, N. Y., Bigham, Englar, Jones & Houston, New York City, for libellant; Lawrence E. Coffey and Fenton F. Harrison, Buffalo, N. Y., of counsel.

Foster, Meadows & Ballard, Detroit, Mich., Arthur E. Otten, Buffalo, N. Y., for respondents.

BURKE, Chief Judge.

This suit involves a claim for damages of $101,230.63 against the barge Hilda and Roen Steamship Company, her owner, growing out of the non-delivery of part of a cargo of lumber delivered to the respondents at Blind

River, Ontario, for carriage on board the barge Hilda, to the libellant at North Tonawanda, N. Y. The cargo was transported under an agreement dated March 21, 1955, and bill of lading which provided that the shipment should be subject to the exemptions from liability contained in the "Carriage of Goods by Sea Act", 46 U.S.C.A. § 1300 et seq. The Hilda, a former car ferry, was converted to a barge in 1940. She is built of steel, her keel length being 338 feet, her beam 56 feet and her depth 19 feet 6 inches. She carries no cargo under-deck. The voyage commenced on November 18, 1955, at Blind River. At the time of the occurrence in Lake Erie, on November 20, she was in tow of the steel tug John Roen III, 107 feet long, beam 24 feet 2 inches, depth 13 feet. Both the barge and the tug were owned and operated by Roen Steamship Company. The cargo consisted of 1,939,039 feet of rough lumber of various lengths and sizes. After passing Long Point on Lake Erie downbound, the wind, which was SW and fresh, was increasing. When the tug and barge were off Dunkirk, N. Y., on November 20, 1955, at 7:30 P.M., the wind shifted from SW to SSW. It continued to increase with resulting higher seas. It reached gale force causing the tug and barge to roll and pitch heavily. At about 10:35 P.M. the tug and barge were abreast of Waverly Shoal, near the north entrance to Buffalo Harbor, when the course was changed to make the north entrance to the harbor. The barge took a very heavy roll to port. A portion of her cargo of lumber went overboard. As she rolled back to starboard some of the lumber on the starboard side went overboard. Practically all of the loss of lumber occurred at this point. The tug and barge continued on at half speed, entered the north entrance of Buffalo Harbor and anchored behind the breakwall. The barge drifted and became stranded on the bottom. With the aid of harbor tugs she was released the next morning. She was then towed to North Tonawanda, where she discharged the remainder of her cargo.

Both libellant and its cargo underwriters knew that the lumber would be carried on deck. The libellant claims the barge was unseaworthy because she lacked proper stability, because she was overloaded for the time and season of the year, and because the cargo was not lashed. It claims also that respondents were negligent with respect to the loading by carrying too great a load and by failing to lash the lumber.

The evidence establishes that the barge encountered winds from 45 to 50 miles an hour, and seas from 12 to 15 feet high. Storms of such severity were not unusual for Lake Erie in November. She had no trouble with the wind behind her. The trouble occurred when she made the turn at Waverly Shoal to direct her course to Buffalo Harbor. She made a turn of about 30 degrees to port. She then got the wind on her port side. Within five minutes she dumped part of her cargo of lumber, first to port, then to starboard. Since there was nothing unusual about the winds and seas for Lake Erie in November, the inference is warranted that the barge was unstable and unseaworthy because the height to which the lumber had been piled on her deck made her so top-heavy that she careened dangerously, first to port, dumping part of her cargo, then to starboard, dumping more of her cargo. After that she made Buffalo Harbor without difficulty. This is additional evidence that it was the height to which the lumber had been piled which had made her heel so as to dump her cargo. No sea peril was involved.

The libellant knew that there was some hazard in on-deck shipments of lumber in November. Jones, libellant's president, originally asked the respondent, by letter dated October 4, 1955, whether respondents were willing to transport a smaller quantity o'' lumber, 1,300,000 or 1,400,000 feet, about November 1st. (The season contract called

for cargoes of approximately 1,900,000 feet each). In the letter libellant wrote "If you can do this, it will also reduce the hazard of late fall shipment, which we are a little bit afraid of." This was an indication by the shipper that the quantity of lumber to be carried had a direct relation to the hazard involved. A telephone conversation followed between Jones and Purves, respondents' traffic manager. Purves asked Jones if he would increase it to 1,750,000, to which Jones agreed. Actually there was loaded for November shipment 1,930,039 feet, about the same amount that was usually carried throughout the shipping season. It was the respondents, not the libellant, who controlled the quantity of the shipment and thus the height to which the lumber would have to be piled on deck. Olsen v. United States Shipping Co., 2 Cir., 213 F. 18, 21.

It was not the fact that lumber was carried on deck which made the barge unstable, it was the quantity of the lumber stowed on deck and thus the height to which the lumber was piled. What the libellant consented to was on-deck stowage of lumber. It may not be held to have consented to on-deck stowage of lumber which would require the piling of the lumber to such a height as would make the barge top-heavy and unstable in wind and seas which at the beginning of the voyage should reasonably have been anticipated and provided for. The warranty of seaworthiness may be negatived only by express covenant. Cullen Fuel Co. v. W. E. Hedger, Inc., 290 U.S. 82, 88, 54 S.Ct. 10, 78 L.Ed. 189; The Carib Prince, 170 U.S. 655, 659, 660, 18 S.Ct. 753, 42 L.Ed. 1181. So loaded she was at the beginning of the voyage unseaworthy to carry a cargo of lumber of the quantity she undertook to transport on this voyage in November. Pioneer Import Corp. v. The Lafcomo, 2 Cir., 138 F.2d 907, 908.

The respondents argue that the barge was not over-loaded because she was not down to her winter load-line. The load-line has no relation to the height to which a cargo of lumber is piled on deck. It has relation only to the dead weight of the cargo. Strictly speaking, the barge was not overloaded because she was not too deep in the water. It does not follow, however, that so loaded she was not top-heavy, nor does it tend to disprove that the height to which the lumber had been piled made her so top-heavy that she heeled dangerously when she got the wind and seas on her port side, wind and seas of a force which at the beginning of the voyage should have reasonably been expected and provided against. Even a charter provision that a deck load shall be at shipper's risk does not cover a risk caused by unseaworthiness. Olsen v. United States Shipping Co., supra, 213 F. at page 21.

The respondents rely mainly on Lawrence v. Minturn, 17 How. 100, 58 U.S. 100, 15 L.Ed. 58, as authority for the assertion that the loss was a result of a "peril of the sea", and so within the exemption provided for in the bill of lading. I do not think that case is controlling on the facts here. The court on page 114 of 58 U.S. said in exceptionally definitive language, "and the law which we intend to lay down, is this: that if the vessel is seaworthy to carry a cargo under deck, and there was no general custom to carry such goods on deck in such a voyage, and the loss is to be attributed solely to the fact that the goods were on deck, and their owner had consented to their being there, he has no recourse against the master, owners, or vessel, for a jettison rendered necessary for the common safety, by a storm, though that storm, in all probability, would have produced no injurious effect on the vessel if not thus laden." The holding in Lawrence v. Minturn absolving a vessel from responsibility for loss of cargo stowed on deck with the owner's consent should not be extended "to such a loading as makes the ship herself unseaworthy when no sea peril is encountered. It would, in our opinion, be unwise and dangerous to impair the

implied warranty of seaworthiness of the ship herself." Olsen v. United States Shipping Co., supra, 213 F. at page 21.

The libellant is entitled to recover against the respondents for its damages with costs, and may have an interlocutory decree providing for reference to a commissioner to take evidence and report on the question of damages. Findings of fact and conclusions of law are filed herewith.